## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. ELH-19-0286** |
| **DARRYL ADAMS, et al.** | |
| **Defendants.** | |

## THE GOVERNMENT'S CONSOLIDATED MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS

**Robert K. Hur**
**United States Attorney**

**LaRai Everett**
**James T. Wallner**
**Assistant United States Attorneys**

**36 S. Charles Street, 4th Floor**
**Baltimore, Maryland 21201**
**Tel.: (410) 209-4800**
**Fax: (410) 962-3124**
**larai.everett@usdoj.gov**

**August 19, 2020**

# TABLE OF CONTENTS

SUMMARY ................................................................................................................5

FACTUAL AND PROCEDURAL BACKGROUND ........................................................9

I.      DEA Investigators discover an area in East Baltimore with a High Volume of
        Street-Level Drug Trafficking ………………………………………………….... 9

II.     August 2018 – Ten-month federal wiretap investigation begins ……………….. 10

III.    March 2019 – DEA investigates the suppliers ………………………………….. 15

ARGUMENT ..........................................................................................................21

I.      THE MOTIONS TO SUPPRESS WIRETAP EVIDENCE (ECF 472, 480, 485,
        489, 492, 496, 502, and 509) SHOULD BE DENIED BECAUSE THE
        WIRETAP ORDERS COMPLIED WITH THE FOURTH AMENDMENT
        AND WITH THE FEDERAL WIRETAP STATUTE ...............................................21

A. The Affidavits Provided Probable Cause for the Requested Wiretaps……………….. 22

B. Application for Target Telephones 1, 2 and 3 – White, Collins and Morris………… 28

C. Application for Target Telephones 4 and 5 – Blackston……………………………. 32

D. Application for Target Telephones 3 and 6 – Morris………......…………………… 37

E. Application for Target Telephone 9 – Blue………………………………………….. 40

F. Application for Target Telephone 12 – Davis………………………………………... 46

G. Application for Target Telephone 13 – Solomon …………………………………… 48

H. There Was No Violation of the Wiretap Minimization Requirements……………… 52

I. The Good Faith Exception Applies Even if the Affidavits Are Found To Be Invalid… 59

II.     Defendants Tony Solomon (ECF 510/589) and Cheyenne Ellison's (ECF 517) Motion
        for Severance Should Be Denied………………………………………………… 60

        A.  Applicable Law ………………………………………………………………… 61

        B.  Defendants were properly joinder under Rule 8 …………………………………64

        C.  Severance of any Defendant will defeat the purpose of conducting joint trials and
            only serve to waste government and judicial resources …………………………64

2

D. A Joint Trial Will Not Prevent either Defendant from Receiving a Fair Trial …..66

E. There Are No Bruton Problems Requiring Severance …………………..……70

III. Defendants Tony Solomon (ECF 508) Motion to Suppress Statements Should be Denied……………………………………………………………………… 71

A. Applicable Law ……………………………………………………… 72

B. The Statements Are Admissible ………………………..……………….....73

IV. Motions to Suppress Fruits of Search Warrants Issued under Fed. R. Crim. Pro. 41 – Daniel Blue (ECF 474), Crosby (ECF 491, 506, 513)……………………… 75

A. Applicable Law……………......…………………………………….. 75

B. The Warrants Were Supported by Probable Cause…………………………. 76

1. Execution of Search Warrant on January 4, 2019 at Blue's Residence (ECF 474) …....................................................................................76

2. The search of Crosby's property on 631 Saint Anns Avenue (ECF 491) …………………………………………………………………....78

3. The search of Crosby's property on 1741 North Dallas Street (ECF 506).... 80

V. Defendant Derek Crosby (ECF 513/514) Motion for a *Franks* Hearing and Motion to Suppress Vehicle Search Should be Denied………………………………… 83

A. The Search of Crosby's Acura TLX Was Valid………….…………... 83

B. A *Franks* Hearing Is Not Warranted …………………………………86

C. The Officers Relied on the Warrants in Good Faith ………………….88

VI. Defendant Daniel Blue (ECF 473) Motion to Suppress Surveillance Evidence Obtained With an Electronic Tracking Device Should be Denied……………………… 89

VII. Defendant Daniel Blue (ECF 475) Motion to Suppress Use of Advanced Technology to Identify Cellular Telephones is Moot …………………………………………..94

VIII. Defendant Daniel Blue (ECF 477) Perez Scruggs' (ECF 499) Motion for Notice Pursuant to Fed. R. Evid. 404(b) and 609 Should be Denied……………………... 95

IX. Motion to Adopt Motions of Other Defendants by Defendants Tony Solomon (ECF 511), Darryl Adams (ECF 481), Brian Blackston (ECF 503), Daniel Blue (ECF 476),

3

Cheyenne Ellison (ECF 483), Charlton Morris (ECF 490), Wardell Roundheart (ECF 493), Perez Scruggs (ECF 495), Ricardo Simon (ECF 518), Malik Williams (ECF 501). …………………………………….……………………………………… 96

X.      Motion for Leave to File Additional Motions or to Supplement Motions by Tony Solomon (ECF 512), Darryl Adams (ECF 482), Daniel Blue (ECF 484), and Ricardo Simon (ECF 519) ………………………………………………………………97

CONCLUSION…………………………………………………………………..97

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. ELH-19-0286** |
| **DARRYL ADAMS, et al.** | |
| **Defendants.** | |

## THE GOVERNMENT'S CONSOLIDATED MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS

The United States of America, by counsel, respectfully submits this Consolidated Response to all 44 pretrial motions submitted by the defendants. For the reasons explained below, the motions should be denied in their entirety.

### SUMMARY

In total, all defendants have filed 44 pretrial motions that remain outstanding.[1] These consist of motions for severance, motions to suppress statements, motions to suppress the fruits of search warrants and warrantless searches, motions for disclosure of evidence pursuant to Federal Rules of Evidence 404(B) and 609, motion for *Franks* hearing, motions to adopt the motions of other defendants, and motions for leave to file for additional motions. Where the relevant facts and legal issues overlap, the government will address groups of motions together.

---

[1] The following are other co-conspirators whose motions, if any, are not included in this response: Amin Boyd, Keizye Collins, Donte Commodore, Egan Davis, George Drummond, Zachory Foster, Delshawn Harvey, Demetrio McCullough, Andre Lemon, Christopher Redd, Wardell Roundheart, Perez Scruggs, Noah Walston, Windeer Washington, Keon White, and Anton Williams. These defendants have either pled guilty or have pending guilty pleas.

A chart of pending motions filed by each defendant follows:

| Defendant | Motion | ECF No. |
|---|---|---|
| Adams, D. | Motion to Adopt Motions Filed by Other Defendants | 481 |
| | Motion for Leave to Amend, Supplement, Withdraw And/Or File Additional Motions | 482 |
| | Motion to Suppress Title III Wiretap Evidence | 485 |
| Blackston, B. | Motion to Join Other Defendants' Pretrial Motions | 503 |
| Blue, D. | Motion to Suppress Evidence Obtained by Electronic Surveillance and Intercepted Communications | 472 |
| | Motion to Suppress Surveillance Evidence Obtained With an Electronic Tracking Device | 473 |
| | Motion to Suppress Tangible and Derivative Evidence Pursuant to Federal Rule 12(b)(3) | 474 |
| | Motion to Suppress Use of Advanced Technology to Identify Cellular Telephones | 475 |
| | Motion to Adopt All Pertinent Motions Filed by Codefendants | 476 |
| | Motion for Disclosure Pursuant to Fed. R. Evid. 404(b) and 609 | 477 |
| | Motion to File Additional Motions, Supplement, And/Or Withdraw Motions | 484 |
| Boyd, A.[2] | Motion to Adopt and Join in Motion of Codefendant | 520 |
| | Motion to Suppress Physical Evidence and Statements | 521 |
| Crosby, D. | Motion to Suppress Illegal Search Pursuant to Warrant | 491 |
| | Motion to Suppress Illegal Wiretap | 492 |
| | Motion to Suppress Illegal Wiretap | 496 |
| | Motion to Suppress Search Pursuant to Warrant | 506 |
| | Motion to Suppress Vehicle Search of Vehicle | 513 |
| | Motion for Franks Hearing | 514 |
| Drummond, G.[3] | Motion to Adopt all Pertinent Motions and Supporting Authority Filed by Co-Defendants | 500 |
| Ellison, C. | Motion to Suppress Evidence from Title III Wiretap | 480 |
| | Motion to Adopt Motions Filed by Co-Defendants | 483 |
| | Motion to Sever Defendants | 517 |
| Harvey, D.[4] | Motion to Adopt Motions Filed by Co-Defendants | 494 |
| Mccullough, D.[5] | Motion to Suppress Statement | 486 |
| | Motion to Suppress Tangible and Derivative Evidence | 487 |
| | Motion to Adopt Motion of Co-Defendants | 488 |
| Morris, C. | Motion to Suppress Evidence from Title III Wiretap | 489 |
| | Motion to Adopt Motions Where Filed by Co-Defendants and Supporting Authority Where Appropriate | 490 |

---

[2] Mr. Boyd recently accepted the plea agreement.

[3] On July 29, 2020, the Court granted counsel's request to withdraw motions. ECF 623.

[4] On July 21, 2020, Mr. Harvey pled guilty.

[5] Mr. McCullough has signed the plea agreement and a re-arraignment is scheduled for August 18, 2020.

| Roundheart, W.[6] | Motion to Adopt All Pertinent Motions and Supporting Authority Filed by Co-Defendants | 493 |
|---|---|---|
| Scruggs, P.[7] | Motion to Adopt Motions Filed by Co-Defendants | 495 |
| | Motion to Suppress Tangible and Derivative Evidence Pursuant to Search of Cell phone | 497 |
| | Motion to Suppress Tangible Evidence | 498 |
| | Defendant Perez Scrugg's Request for Government's Intention to Use Rule 404(b) Evidence at Trial | 499 |
| Simon, R.[8] | Motion to Join and Adopt Motions of Co-Defendant | 518 |
| | Motion to File Additional Motions, and Supplement or Withdraw Motions, Upon Completion of Discovery | 519 |
| Solomon, T. | Motion to Suppress Statements | 508 |
| | Motion to Suppress Evidence Obtained by Electronic Surveillance and Interception by Wire | 509 |
| | Motion to Sever Defendants | 510 |
| | Motion to Adopt all Pertinent Motions Filed by Co-Defendants | 511 |
| | Motion for Leave to File Additional Motions | 512 |
| | **Motion for Severance of Defendants Under Rule 14** | **589** |
| Williams, M. | Motion to Adopt all Pertinent Motions Filed by Codefendants | 501 |
| | Motion to Suppress Title III Evidence | 502 |

In ECF 472, 480, 485, 489, 492, 496, 502, and 509 the defendants seek to suppress evidence obtained during wiretap interceptions of their cellular phones. The wiretaps in question were conducted pursuant to valid federal wiretap orders, which complied with all of the requirements of 18 U.S.C. § 2518. Therefore, the wiretap suppression motions should be denied.

In ECF 473, defendant Daniel Blue seeks the suppression of evidence obtained during court-authorized GPS tracking of his motor vehicle. The GPS tracking was conducted pursuant to lawfully issued federal tracking warrants, and therefore that motion should also be denied.

---

[6] Counsel and the government are in plea negotiations. The parties anticipate a resolution short of trial.

[7] As of August 3, 2020, counsel advised that Mr. Scruggs would be pleading guilty. At this time, we are waiting for Mr. Scruggs signature on the plea agreement. Therefore, ECF 497 and 498 have not been addressed.

[8] Counsel and the government are in plea negotiations. The parties anticipate a resolution short of trial.

In ECF 474, 491 and 506, defendants Daniel Blue and Derek Crosby seek the suppression of evidence taken from their residence pursuant to a federal search warrant.  The search warrant was proper on its face and was lawfully issued based on the investigation.  Law enforcement officers were therefore permitted to search the defendant's residence. The evidence obtained during that process is admissible.

In ECF 475, defendant Daniel Blue seeks the suppression of evidence obtained from an order obtained on October 19, 2018, which allowed law enforcement to use advanced technology to identify alternate cellular telephones in the possession of Blue.  The search warrant was never executed and therefore, no evidence was obtained. As a result, this motion is moot.

In ECF 477, defendant Daniel Blue seeks disclosure of the government's intention to use FRE 404(b) and 609 evidence at their trials.

In ECF 508, defendant Tony Solomon seeks the suppression of statements taken from him at the time pursuant to a federal search warrant.  The search warrant was proper on its face and was lawfully issued based on the investigation.  Law enforcement officers were therefore permitted to search the residence.  Additionally, the defendant's statements were obtained after a proper *Miranda* advisement and therefore, any statements made relative to the search warrant was proper. The evidence obtained during that process is admissible.

In ECF 513, defendant Derek Crosby seeks suppression of evidence taken from his vehicle pursuant to a federal search warrant.  The search warrant was proper on its face and was lawfully issued based on the investigation.  Law enforcement officers were therefore permitted to search the defendant's vehicle.  The evidence obtained during that search is admissible.

In ECF 514, defendant Derek Crosby requests a *Franks* hearing to assess the veracity of statements in the affidavits supporting the search warrants for Crosby's vehicle.  The affidavits did

not contain false information, and the search warrants that were approved by U.S. Magistrate Judge A. David Copperthite were facially valid affidavits.  Law enforcement officers acted reasonably in relying on the warrant based on the information they had at the time, and so were permitted to search Crosby's vehicle. The evidence obtained during that process is admissible, and a *Franks* hearing is not necessary since the information included in the affidavits were not untrue or misleading.

In ECF 510 and ECF 517/589, defendants Cheyenne Ellison and Tony Solomon seek to be severed from the other defendants. The two defendant's activities largely coincide with the other defendants, with all of them working together to promote their drug sales.  Furthermore, denying their motion for severance would not unduly prejudice either defendant, as the evidence against other defendants would not unfairly affect the two defendant's cases. Therefore, the defendant's motions should be denied.

In ECF 476, 481, 483, 490, 501, 503, 511, and 518 the defendants seek to adopt all pertinent motions filed by the other co-defendants in the conspiracy. The government does not oppose; however, we do request the defendants particularize their request to specific motions, rather than a general request to adopt all related motions filed by other defendants.

Finally, in ECF 482, 484, 512, and 519 defendants Darryl Adams, Daniel Blue, Ricardo Simon, and Tony Solomon seek more time to file additional motions in response to new discovery. The government does not oppose these motions.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   DEA Investigators discover an area in East Baltimore with a High Volume of Street-Level Drug Trafficking

Beginning in July 2018, investigators from the Drug Enforcement Administration ("DEA")

and the Baltimore Police Department ("BPD") investigated drug-trafficking and violence associated with the Monument Street corridor in east Baltimore.  Monument Street bisects a section of east Baltimore, bracketed to the north by Ashland Avenue; to the south by Jefferson Street; North Patterson Park Avenue to the west, and North Belnord Avenue to the east. Investigators began conducting several controlled undercover purchases of narcotics in this area, implementing confidential informants from the area as well as undercover Baltimore Police Department (BPD) detectives. The investigation identified several street-level drug trafficking shops, with the most prominent ones located in the 400 block of North Montford Avenue at Jefferson Street (the Montford DTO) and in the 2400 block of East Monument Street at Port Street (the "Out the Mud" DTO; (OTM DTO)).  As a result, investigators identified members of the Montford DTO and OTM DTO charged in the above-captioned indictment, including defendants Daniel Blue, Tony Solomon, and Cheyenne Ellison.

## II. August 2018 – Ten-month federal wiretap investigation begins

In August 2018, after conducting several undercover purchases and gathering intelligence on the DTOs, investigators pursued two wiretap investigations.  The first investigation began in August 2018 and concluded in January 2019 and intercepted 18 lines.  During this initial wiretap, investigators identified Daniel Blue, Egan Davis, and Tony Solomon as the sources of supply for both the Montford and OTM DTOs, as well as other drug traffickers in Baltimore.  During that first wiretap, investigators also identified Anton Williams and Delshawn Harvey as sources of supply for Egan Davis.  Investigators identified Harvey as William's partner and as an alternate source of supply to Davis. In March 2019, as a result of identifying Williams and Harvey, investigators began a second wiretap on Williams and Harvey.  This wiretap concluded in May 2019 and intercepted 6 lines.  The investigation included a number of techniques, including

informant interviews, physical surveillance; surveillance via covert cameras, electronic GPS surveillance of vehicles and phones, and controlled purchases of narcotics.   Additionally, investigators secured orders from the Honorable James K. Bredar, United States Chief Judge, to conduct wiretap monitoring over a series of cellular telephones, pursuant to the following applications:

| DATE OF APPL'N & ORDER | TARGET TELEPHONE NUMBER | TARGET TELEPHONE NUMBER | USER |
|---|---|---|---|
| 08/20/2018 | 1, 2, 3 | 443-894-5391, 443-314-9198, 443-630-8765 | Keon White, Keizye Collins, Charlton Morris |
| 09/05/2018 | 4 | 410-344-3933 | Brian Blackston |
| 09/17/2018 | 1, 2, 5, 6 | 443-894-5391, 443-314-9198, 443-509-7642, 410-299-3150 | Keon White, Keizye Collins, Brian Blackston, Charlton Morris |
| 10/01/2018 | 7, 8, 9 | 443-754-3154, 443-717-4241, 443-345-6763 | Brian Blackston, Noah Walston, Daniel Blue |
| 10/30/2018 | 9, 10, 11, 12 | 443-345-6763, 443-563-8916, 347-285-4064, 443-928-5768 | Daniel Blue, Noah Walston, Delshawn Harvey, Egan Davis |
| 11/29/2018 | 9, 12, 13, 14 | 443-345-6763, 443-928-5768, 410-900-2621, 443-903-9076 | Daniel Blue, Egan Davis, Tony Solomon, Richard Cherry |
| 12/27/2018 | 9, 12, 13, 14 | 443-345-6763, 443-928-5768, 410-900-2621, 443-903-9076 | Daniel Blue, Egan Davis, Tony Solomon, Richard Cherry |
| 01/03/2019 | 15 | 404-353-1598 | Andre Clark |

| DATE OF APPL'N & ORDER | TARGET TELEPHONE NUMBER | TARGET TELEPHONE NUMBER | USER |
|---|---|---|---|
| 1/23/2019 | 15, 16, 17, 18 | 404-353-1598, 410-805-9705, 443-825-5922, 202-227-8579 | Andre Clark, Egan Davis, Anton Williams Unknown Male |
| 03/11/2019 | 1 | 443-301-8730 | Anton Williams |
| 04/03/2019 | Roving 2 | 443-301-2579 | Anton Williams |
| 04/05/2019 | Roving 2A | 443-447-1165 | Anton Williams |
| 04/11/2019 | 3 | 443-673-7043 | Delshawn Harvey |
| 04/12/2019 | Roving  2B | 443-854-8598 | Unknown Male |
| 04/24/2019 | Roving 2C | 443-756-1595 | Anton Williams |
| 05/14/2019 | 4, 5, 6 | 443-477-1165, 443-756-1595, 443-922-3272 | Anton Williams, Anton Williams, Delshawn Harvey |

The wiretaps ran from August 2018 until May 2019.  During the course of the wiretaps, investigators monitored thousands of voice and text communications during which the members of the conspiracy engaged in drug-related talk.[9]  Ultimately, the investigation revealed that all of the charged defendants (and others) were members of the drug conspiracy, and their roles:

Charlton Morris (the user of Target Telephones 3 and 6), AKA "Dartin," was a lieutenant for the OTM DTO and distributed drugs in the Monument Street area. Morris used several individuals to sell drugs for him, such as Keizye Collins (the user of Target Telephone 2). BPD conducted an undercover buy with Morris on August 23, 2018 and recovered fentanyl.

Brian Blackston (the user of Target Telephone 4, 5, and 7), AKA "So Big," was a distributor of drugs for the OTM DTO and acted as a Lieutenant for the OTM DTO. Blackston

---

[9] Example of the intercepted narcotics-trafficking conversations monitored on the Target Telephones are discussed in greater detail in section I of the Argument, *infra*.

distributed drugs on behalf of the OTM DTO in the Monument Street area.

Darryl Adams, AKA "Q," was a drug distributor for the Montford DTO. BPD had conducted five undercover controlled purchases with Adams, in which crack-cocaine, fentanyl, and heroin was purchased.   Adams' phone was intercepted over Blackston's line (Target Telephone 7).

Daniel Blue (the user of Target Telephone 9) was a supplier for the Montford and OTM DTO. He worked alongside Egan Davis (the user of Target Telephone 12 and 16) to maintain his supply to the DTOs.  He received his supply primarily from Solomon. Blue also operated on the street and made numerous deals to convey quantities of cocaine and heroin to the DTOs.

Egan Davis (the user of Target Telephones 12 and 16) was a supplier for the Montford and OTM DTO.  He worked alongside Daniel Blue.  He received his supply primarily from Blue and Delshawn Harvey/Anton Williams.

Cheyenne Ellison worked for Egan Davis who provided heroin to Davis and also coordinated CDS transactions between Davis and cocaine sources of supply, such as Anton Williams and Delshawn Harvey.  Several calls were intercepted between Ellison and Davis (over Target Telephone 12) concerning purchasing cocaine and CDS.  Ellison's phone was intercepted over Davis' line (Target Telephone 12).

Derek Crosby, AKA "Mice," was a source of supply for the Montford DTO.  Several calls were intercepted between Crosby and Blue discussing where they would meet to exchange drugs.  Crosby also worked for Egan Davis in assisting him manage his supply. Crosby's phone was intercepted over Daniel Blue's intercepted line (Target Telephone 9) and Egan Davis' intercepted line (Target Telephone 12).

Ricardo Simon was a drug distributor for the OTM DTO.  Simon was intercepted talking to Blue (Target Telephone 9) and Davis (Target Telephone 12), regarding drug trafficking activities.  Simon also reached out to Blue using Malik Williams' phone, another drug distributor for the OTM DTO.

Malik Williams was a drug distributor for the OTM DTO.  BPD conducted three undercover controlled purchases with M. Williams, recovering fentanyl and cocaine. Several calls were intercepted between M. Williams and Blue where they would discuss meeting on Monument Street or elsewhere to exchange drugs.

Wardell Roundheart was a customer of Davis and Blackston, and on two different undercover purchases with BPD, he provided heroin, methamphetamine, and fentanyl.  During one of the undercover purchases, Roundheart directed the undercover officer to another male, who gave the officer capsules of heroin.

Tony Solomon (the user of Target Telephones 13) was a supplier for Daniel Blue, who supplied both the Montford and OTM DTO.  Solomon engaged in several phone conversations, over a period of months, in which he discussed drug deals, maintained his own drug supply, and made deals with distributors such as Daniel Blue.  Solomon had people working for him as part of his activities.  He trafficked in cocaine and heroin and – as ultimately discovered by investigators – fentanyl.

George Drummond assisted Solomon in securing his supply and money.  Solomon obtained drugs for his customers from Drummond's home, as well as would meet his associates to collect money and provide additional product to them at Drummond's home.  Furthermore, Solomon is Drummond's wife's uncle, further indicating their collaboration.  Drummond's home was a primary stash location for Solomon.  Police surveillance observed Solomon from time to time

leave Drummond's home with drugs.

Demetrio McCullough was Solomon's customer and served as a middle-man between Solomon and other CDS customers. McCullough distributed CDS and other drugs he received from Solomon.  McCullough's phone was intercepted over Solomon's intercepted line (Target Telephone 13).

### III. March 2019 – DEA investigates the suppliers

In March 2019, DEA initiated a wiretap investigation for Anton Williams and Delshawn Harvey.  Both were suspected to be suppliers for Egan Davis, who worked with Blue and Solomon to supply DTOs.  During the surveillance of both Harvey and Williams, investigators identified these individuals as working with them: Amin Boyd, Andre Lemon, and Perez Scruggs.  Overall, Williams and Harvey conspired with the other members of the conspiracy to distribute over 5 kilograms of cocaine, 280 grams of crack, 1 kilogram of heroin, and fentanyl to members of the DTOs and other drug traffickers.

Anton Williams (user of Target Telephone 17 and the user of the 2019 Target Telephone 1, Roving Target Telephone 2, Roving Target Telephone 2A, Roving Target Telephone 2C, 4, and 5) was previously intercepted during the original investigation and is also believed to be the supplier for other drug traffickers in the Baltimore area.  Davis, who was an upper-level drug trafficker responsible for supplying other traffickers in the Baltimore area, was primarily supplied by Anton Williams. Williams was intercepted on numerous occasions talking to customers as well as his associates such as Harvey, Scruggs, and Davis.  Williams was also charged with money laundering under §18 U.S.C. 1956, as he was intercepted on various calls discussing how to move his money into his legal businesses, such as Rosie's Bar.  In addition to this bar, investigators

learned through the investigation that he owns or leases up to nine different properties, all purchased with drug trafficking money.

Delshawn Harvey (user of Target Telephone 11 and 2019 Target Telephones 3 and 6), AKA "Dell," was a source of supply of cocaine for individuals such as Davis.  Investigators also intercepted Harvey on numerous occasions talking to customers as well as his associates such as Williams, Davis, Andre Lemon, and others.  On October 6, 2018, investigators heard Harvey inform Davis that cocaine was $4500 per eighth of a kilogram, and later observed Harvey and Davis meet to exchange nearly $19,000 for four eighths of a kilogram of cocaine.

Amin Boyd was a drug customer of Williams and worked for Williams from time to time as a "cook" in creating cocaine.  Several calls and texts were intercepted between Williams and Boyd involving discussions of cooking cocaine and scheduling times to meet to purchase drugs. Lemon also worked as Harvey's assistant in distributing drugs.

Perez Scruggs was a customer of Williams who would also distribute drugs to others. Several calls and texts were intercepted between the two where they scheduled times to meet for Scruggs to purchase drugs.

Overall, the wiretap investigation identified several members of both DTOs.  On several other occasions, investigators found and seized drug supplies maintained by the conspiracy and firearms possessed by members of the conspiracy.  For example:

- On July 19, 2018, an undercover detective purchased four ziplock bags of cocaine base from Darryl Adams a/k/a "Q," in the 400 block of North Montford Avenue. This same undercover detective also obtained Adam's cellular telephone number which was 681-522-2031.

- On July 25, 2018, investigators observed two hand to hand buys with Adams in the 2300 block of Jefferson Street and on July 31, 2018 in the 400 block of N. Port Street.

- On July 26, 2018, an undercover detective purchased four ziplock bags containing cocaine base from an unknown male and Adams in the 400 block of North Montford Avenue.  Another undercover detective told the males that he was "looking for 'Q' but he's not answering his phone."  Adams stated, "I'm Q."  The undercover detective and Adams then engaged in a brief conversation during which Adams provided the undercover detective with cellular phone number 681-522-2031.  As the undercover detective left the area, he/she asked Adams, "What time y'all come up in the morning?"  Adams replied, "Whatever time you call me."

- On August 2, 2018, an undercover detective purchased two ziplock bags containing cocaine base from Adams and two gelatin capsules containing a mixture of fentanyl and tramadol from another individual working with Adams in the 400 block of North Montford Avenue.

- On August 23, 2018, an undercover detective purchased nine gelatin capsules containing a mixture of tramadol and fentanyl from Morris.  The undercover detective believed he was purchasing heroin.

- On September 17, 2018, investigators used CCTV cameras and observed Morris enter an alley in the 800 block of N. Bradford to meet with Keizye Collins to exchange drugs.

- On September 25, 2018, an undercover detective purchased two blue ziplock baggies containing cocaine base and two red and white gelatin capsules containing a mixture of heroin, tramadol and fentanyl from Adams.  The same day, another undercover detective entered the area and purchased six blue zip lock bags containing cocaine base from Adams.

- On October 30, 2018, M. Williams directed the undercover detective to a location to purchased ten gelatin capsules containing a mixture of tramadol and fentanyl from an unknown male.  The undercover detective believed he was purchasing heroin.

- On January 2, 2019, investigators executed a search and seizure warrant at Windeer Washington's residence located at 2938 McElderry Street, Baltimore, Maryland.  During the search, investigators recovered approximately 118 grams of cocaine and fentanyl mixture and 34 grams of crack cocaine, a small hydraulic press and mail in Washington's name.  After Washington was advised of his Miranda rights, he told the investigators, "it's mine," referring to the seized controlled dangerous substances.  During the search warrant, investigators called Washington's number and his phone rang.  This was the same number intercepted calling Blue during the course of the wiretap.

- On January 8, 2019, investigators executed a search and seizure warrant at Blue's residence located at 1202 Roxboro Road, Rosedale, MD. Blue was advised his of

*Miranda* rights, and he verbally acknowledged that he understood.  When asked if there were any valuables, guns or large sums of money in the locations, Blue stated that there was $30,000 in a bag in the back part of the basement.  Investigators recovered 3 cell phones; a Taurus .45 caliber LC/410 gauge HG w/3 410 gauge shells under the basement stairs in a bag, 2 watches, Louis Vuitton and Rolex, Kahr .45 caliber HG with 5 rounds in the family room couch pillow, knotted plastic bag with ½ ounce powder substance confirmed non-CDS in the kitchen cabinet, and $45,817 in U.S. currency. Additionally, during the execution of the warrant, investigators called TT9 and TT9 rang.

- On November 13, 2018, after investigators intercepted Crosby and Blue (Target Telephone 9), investigators conducted surveillance at 602 N. Potomac Street, identified as Blue's mother's residence. Investigators observed Crosby parked in front of the home and met with Blue. Crosby's left front pants pocket was weighted down, believed to be money to pay for drugs based on previous deals.

- On January 17, 2019, investigators executed a search and seizure warrant at Davis' house at 4308 Bedrock Circle, Unit #202, Nottingham, Maryland, and recovered a quantity of approximately 1400 grams of cocaine/crack cocaine, digital scales with residue, assorted packaging materials, and $21,708.  Based on wiretap communications, investigators believe that a portion of the cocaine/crack cocaine seized during the execution of the warrant was coordinated by Ellison and Harvey.

- On January 23, 2019, investigators executed a search and seizure warrant at Solomon's stash location at 1641 Spring Street, Baltimore, MD. Solomon conspired with coconspirators to use this location to meet with drug customers for the purposes of collecting money and providing controlled substances to them. On January 23, 2019, investigators executed a search and seizure warrant at 1641 N. Spring Street, Baltimore, Maryland and recovered approximately 200 grams of cocaine base and approximately 5 grams of cocaine, as well as a digital scale, 465 gel caps with confirmed Tetrahydrocannabinol (THC), and approximately 42 grams of marijuana packaged in vacuum sealed bags.  Additionally, investigators located a .40 caliber semi-automatic pistol, bearing serial number PVK637, and a .40 caliber magazine loaded with thirteen .40 caliber bullets.  The defendant admits that he possessed the cocaine and cocaine base with the intent to distribute them for sale.

- On January 23, 2019, investigators executed a search and seizure warrant at Solomon's residence at 3528 Reisterstown Road, Baltimore, MD. After Solomon was read his *Miranda* rights, he told investigators that he had $20,000 in his bedroom under a dog bed. Investigators recovered a total of $41,912 in U.S. currency and several pieces of jewelry valued at $283,200.

- On January 23, 2019, investigators executed a search and seizure warrant at Solomon's stash location at 3201 Brighton Street, Baltimore, MD. Investigators

located in the house George Drummond and Nicole Drummond, who were arrested. After G. Drummond was advised of his *Miranda* rights, he stated to investigators he had "weed" in the grill in the basement and in his car. Investigators recovered a large amount of cutting agents (quinine, caffeine), approximately 147 grams of a mixture containing heroin and fentanyl, one large kilo press and one small kilo press (used for packaging controlled substances), multiple bags of gelatin capsules and one loaded Glock 37 .45 caliber, semi-automatic pistol bearing serial number GAF795 with 8 .45 caliber cartridges, and mail in Solomon's name.  G. Drummond also indicated that Tony Solomon, his wife's uncle, had access to the house and had previously resided there at one point but never returned the key.  Drummond and Solomon are prohibited from possessing a firearm.

- On February 8, 2019, a search and seizure warrant was executed at 1315 Milton Avenue, Baltimore, Maryland believed to be McCullough's residence, and investigators recovered approximately 43 grams of a mixture containing heroin and 39 grams cocaine and cocaine base.  Additionally, two boxes of ammunition were recovered, specifically a box containing 9mm ammunition and a box containing .38 special ammunition.

- On February 19, 2019, Roundheart directed an undercover detective to another individual to purchase ten gelatin capsules containing a mixture of tramadol and fentanyl from an unknown male.  The undercover detective believed he was purchasing heroin.

- On February 21, 2019, an undercover detective purchased four green top vials of cocaine from M. Williams. The undercover detective believed he was purchasing crack cocaine.

- On February 22, 2019, Roundheart directed the undercover detective to another individual to purchase four clear top vials of cocaine and ten gelatin capsules containing a mixture of tramadol and fentanyl from an unknown male.  The undercover detective believed he was purchasing crack (cocaine base) and heroin.

- On March 14, 2019, an undercover detective approached Williams to purchase narcotics and M. Williams directed the undercover detective to an associate who ultimately sold the undercover detective one clear top vial and one green top vial containing cocaine.  The undercover detective believed he was purchasing crack cocaine.

- On May 22, 2019, investigators executed a search and seizure warrant at 337 Suter Road, Apartment B, Baltimore, Maryland, a house associated with Lemon and recovered approximately 600 grams of cocaine and a digital scale.  Additionally, investigators recovered a Taurus .410 caliber "the Judge" handgun fully loaded with 5 rounds, serial number GX845592, a box of .410 caliber ammo, as well as approximately $19,675.00, believed to be drug trafficking proceeds.

- On May 22, 2019, investigators executed a search and seizure warrant at 2454 Keyworth Avenue, Baltimore, MD. This is Reginald Pulley's house, who is Harvey's father. Pulley indicated that his son Harvey and his associates had access to the home. During the search, investigators recovered approximately 1000 grams of cocaine, digital scales with residue, assorted packaging materials, a Davis Ind. P380 semi-automatic pistol, serial number AP387033 with ammunition, specifically 10 .40 cartridges, and a Taurus PT140 Millennium G2, semi-automatic pistol, serial number SGX93641 with ammunition, specifically 6 .380 cartridges. Harvey is prohibited from possessing a firearm.   Harvey is prohibited from possessing a firearm.

- On May 23, 2019, a search and seizure warrant was executed at 1618 Ramblewood Road, Baltimore, MD. Harvey was present at this search, and advised investigators after he was read his *Miranda* rights that he had money in a dresser drawer. Investigators recovered a total of $13,213 in U.S. currency, believed to be drug proceeds. Investigators also recovered one electronic money counter, a cellphone, and additional monies.

- On May 23, 2019, a search and seizure warrant was executed at Scruggs' residence at 2420 Woodbrook Avenue. Investigators recovered kilo wrappers, mail in Scruggs' name, approximately 255 grams of a mixture containing cocaine, an electric scale with residue.  Additionally, investigators recovered three firearms and ammunition.  Specifically, investigators recovered a Walther HK MP5 .22 caliber long rifle semi-automatic serial number WG012576; a High Std, J.C. Higgins 20, 12 gauge shotgun pump action, no serial number, and a Remington Arms 11-87 Sportsman 12 gauge shotgun semi-automatic serial number PC803108 with extended magazine, and five 12 gauge cartridges mounted on the side of the weapon, and six 9mm cartridges, as well as one additional 12 gauge shotgun shell found in a china cabinet.  The defendant admits that he possessed the cocaine with the intent to distribute it for sale.  Scruggs is prohibited from possessing a firearm.

- On May 22, 2019, a search and seizure warrant was executed at Anton Williams's residence at 3601 Clarks Lane, Apartment #522, Baltimore, MD. Investigators recovered U.S. currency, a money counter, ten cellphones, a checkbook, a Rolex watch, two electronic scales, a fully loaded Colt Army Special .38 caliber revolver, and two additional .38 caliber cartridges. The investigation revealed two other vehicles utilized by Anton, specifically, a 2014 Toyota Venza bearing Maryland registration 56950CH listed to Anton Williams and a 2018 Lexus LC 500 coupe with no listing. Investigators executed a search warrant on both vehicles after K-9 alerted to possible narcotics in both vehicles. In the Venza, one clear bag containing a white powder substance was recover, one DTLR bag containing multiple bags containing white rock substance, and multiple bags containing a tan substance, one red book bag containing one clear bag containing white rock substance, and drug paraphernalia with residue. Analysis confirmed 76 grams of fentanyl from the car.

Anton Williams is prohibited from possessing a firearm.

- On June 19, 2019, investigators executed a search and seizure warrant at 1741 Dallas Street, Baltimore, Maryland, a residence owned by a Derek Crosby. Lewis, along with Crosby possessed with intent to distribute approximately 677 grams of a fentanyl and heroin mixture, and approximately 2.4 grams of crack cocaine. Upon entry, investigators located Lewis and arrested Lewis and investigators recovered approximately 11 grams of fentanyl from Lewis's person, as well as his cellphone.

Based on the wiretap and other evidence, a federal Grand Jury returned an indictment on June 11, 2019 charging the defendants with conspiracy to distribute over 5 kilograms of cocaine, 280 grams of crack, 1 kilogram of heroin, and fentanyl, in violation of 21 U.S.C. § 846, several counts of Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c) as well as several counts of Possession of a Firearm and Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1). ECF 23. On June 25, 2019, an additional six defendants were indicted in a Superseding Indictment with 30 counts that included the above charges as well as a one count of Money Laundering in violation of 18 U.S.C § 1956. ECF 96. In the instant motions, the aforementioned defendants seek the suppression of the wiretap and certain other evidence in the case.

## **ARGUMENT**

I.  **THE MOTIONS TO SUPPRESS WIRETAP EVIDENCE (ECF 472, 480, 485, 489, 492, 496, 502, 509) SHOULD BE DENIED BECAUSE THE WIRETAP ORDERS COMPLIED WITH THE FOURTH AMENDMENT AND WITH THE FEDERAL WIRETAP STATUTE.**

As already discussed at the length in the background section, between August 2018 and May 2019, DEA obtained federal wiretap authorizations for a series of phones belonging to many

DTO members, to include Blue,[10] Crosby[11] and Solomon[12].  The defendants challenge the wiretap authorizations.[13]  Collectively, the defendants essentially argue the wiretap authorizations were not supported by probable cause, normal investigative procedures were not fully exhausted and therefore the wiretaps were unnecessary, and the statutory minimization and termination-upon-attainment requirements were not properly observed.  Blue, Crosby and Solomon cite to some portions of the wiretap affidavit in support of their claims, however, the majority of the arguments by the other defendants are boilerplate and provide little to no support of their respective claims.

As an initial matter, "[t]he defendant has the burden of demonstrating that a wiretap order is invalid." *United States v. Jayson*, 52 F.3d 322, *5 (4th Cir. 1995) (unpub.) (citing *United States v. Nunez*, 877 F.2d 1470, 1472 (10th Cir. 1989)); *see also United States v. Quintana*, 70 F.3d 1167, 1169 (10th Cir. 1995) ("[A] wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this presumption.").  Furthermore, "great deference" should be given to the determination of the issuing judge. *United States v. DePew*, 932 F.2d 324, 327 (4th

---

[10] Blue maintains that the intercepts, monitoring, and searches were conducted illegally, and the products thereof must be suppressed and not used as evidence against the defendant in this criminal case.  ECF 472 at 2.  Blue further argues that the interceptions were not properly terminated and that any product of the wiretap after attainment of authorized objections must be suppressed. *Id.*

[11] Crosby argues that a wiretaps for Daniel Blue, Target Telephone 9 was not supported by probable cause.  ECF 492 at 1.  Similarly, Crosby argues that the wiretap for Egan Davis, Target Telephone 12 was not supported by probable cause and relies on illegally obtained evidence.  ECF 496 at 1.

[12] Solomon argues that the wire communications were unlawfully intercepted, not made inconformity with the Order Authorizing the Interception of Wire Communications and the orders under which they were made were intercepted were insufficient.  ECF 509 at 2.

[13] Motion to Suppress Evidence Obtained by Electronic Surveillance and Interception by Wire by Daniel Blue (ECF 472) and Tony Solomon (ECF 509). Additionally, Motion to Suppress Evidence from Illegal Wiretap/Title III Wiretap by Cheyenne Ellison (ECF 480), Darryl Adams (ECF 485), Charlton Morris (ECF 489), Derek Crosby (ECF 492/496), and Malik Williams (ECF 502).

Cir. 1991); *see also United States v. McKinney*, 785 F. Supp. 1214, 1220 (D. Md. 1992) ("determinations by an issuing judge are accorded substantial deference").

We address the defendants' arguments in turn below.

**A.     The Affidavits Provided Probable Cause for the Requested Wiretaps**

Title 18 of the United States Code, Section 2518(3)(a) provides that an application for a wiretap must contain facts establishing probable cause that an individual is committing, has committed, or is about to commit one of the offenses enumerated in 18 U.S.C. § 2516.  Section 2518(3)(b) states that a wiretap application must contain facts establishing probable cause for belief that communications concerning that offense will be obtained through interception.  Section 2518(3)(d) provides that an application for a wiretap must contain facts establishing probable cause that: (1) that the target facilities are being used or are about to be used in connection with an enumerated offense; (2) that the target facilities are leased to or listed in the name of an individual believed to have committed an enumerated offense; or (3) that the target facilities are commonly used by an individual believed to have committed an enumerated offense.

The standard of review governing affidavits in support of wiretap orders is identical to the standard governing the review of search warrants; for a wiretap order is a specialized sort of search warrant.  *United States v. Talbert*, 706 F.2d 464, 467 (4th Cir. 1983); *United States v. Brewer*, 204 Fed. Appx. 205, 207 (4th Cir. 2006).  Section 2518(3)(b) does not require proof beyond a reasonable doubt, but rather a "fair probability" that evidence of criminal conduct will be obtained through interception of communications.  *Id*.  Moreover, "[a]pplications for electronic surveillance orders, like search warrants, are to be read 'in a common sense and realistic fashion.'"  *McKinney*, 785 F. Supp. at 1219 (quoting *United States v. Errera*, 616 F. Supp. 1145, 1149 (D. Md. 1985), and *Illinois v. Gates*, 462 U.S. 213, 237–38 (1983)).  In a close case, reviewing courts should

resolve doubts in favor of upholding wiretap orders, as they do with respect to search warrants. *See United States v. Ventresca*, 380 U.S. 102, 109 (1965).

It is axiomatic that such affidavits must be tested and interpreted by magistrates in a common sense and realistic fashion . . . Technical elaborate specificity once exacted under common law pleadings have no proper place in this area. *United States v. Ventresca*, 380 U.S. 102, 108 (1965). It is sufficient that the information in the affidavit, when assessed in its totality, was sufficient to support a reasonable belief that evidence of criminality by the subject of surveillance would be obtained. *United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir. 1988). When an issuing judge makes a finding of probable cause, a reviewing court should not review that decision in a "hypertechnical, rather than common sense manner." *Ventresca*, 380 U.S. at 109. A reviewing court is not to substitute its judgment as to probable cause, but need only determine whether there was a substantial basis for the issuing court's determination of probable cause. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). In applying for an order authorizing interception of electronic communications, "it is not necessary for the applicant to prove beyond a reasonable doubt that the communications concerning the offense will be obtained, but only that there is a fair probability thereof." *United States v. Depew*, 932 F.2d 324, 327 (4th Cir. 1991).

Section 2518(3)(b) does not require proof beyond a reasonable doubt, but rather a "fair probability" that evidence of criminal conduct will be obtained through interception of communications. *Id.* Moreover, "[a]pplications for electronic surveillance orders, like search warrants, are to be read 'in a common sense and realistic fashion." *McKinney*, 785 F. Supp. at 1219 (quoting *United States v. Errera,* 616 F. Supp. 1145, 1149 (D Md. 1985), and *Illinois v. Gates*, 462 U.S. 213, 237-38 (1983)). The "determinations by an issuing judge are accorded substantial deference" when reviewing wiretap orders. *United States v. McKinney*, 785 F. Supp. 1214, 1220

(D. Md. 1992).  In *McKinney*, Chief Judge Black further explained:

> Applications for electronic surveillance orders, like search warrants, are to be read in a common sense and realistic fashion. … Assessments concerning probable cause are to be made after the totality of the circumstances test has been used to determine the adequacy of the application. … The function of this Court, which is essentially reviewing the previous findings of [the issuing judge], is not to make de novo determinations of sufficiency as if it were [an issuing judge], but to decide if the facts set forth in the application were minimally adequate to support the determination that was made.
> *Id*. (internal citations omitted).  *See also Depew*, 932 F.2d at 327.

In a close case, reviewing courts should resolve doubts in favor of upholding wiretap orders, as they do with respect to search warrants. *See United States v. Ventresca*, 380 U.S. 102, 109 (1965).  In addition to showing probable cause, wiretap affidavits must also make a required showing of the exhaustion of alternative techniques.  Title 18 of the United States Code, Section 2518(1)(c), provides in pertinent part that each application for a wiretap shall include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  Section 2518(3)(c) provides that a judge may issue an order authorizing a wiretap if the application provides facts showing that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

The Fourth Circuit has held that the appellate court owes "considerable deference" to the district court's determination that the exhaustion requirement of section 2518(3)(c) was satisfied. *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995); *United States v. Smith*, 31 F.3d 1294, 1298 (4th Cir. 1994) (declining to announce a standard of review but, after reviewing various standards applied in other circuits, holding that the standard should be one that gives the issuing judge's exhaustion determination considerable deference); *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (same).  Accordingly, an issuing judge's determination that the exhaustion

requirement was satisfied should be accorded the highest degree of deference.

Sections 2518(1)(c) and (3)(c) of Title 18 were designed "to ensure that the relatively intrusive device of wiretapping was not routinely employed as the initial step in an investigation nor resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Smith*, 31 F.3d at 1297 (internal citations); *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). The Fourth Circuit has held that while wiretaps are an extraordinary investigative tool, they are also necessary tools of law enforcement and that 2518(1)(c) should not be read in an overly restrictive manner. *United States v. Leavis*, 853 F.2d 215, 221-22 (4th Cir. 1988). The Fourth Circuit has also repeatedly observed that, [T]he burden that these provisions impose upon the government to show the inadequacy of normal investigative techniques is not great, and the adequacy of such a showing is 'to be tested in a practical and commonsense fashion'...that does not hamper unduly the investigative powers of law enforcement agents. *Smith*, 31 F.3d at 1297 (quoting *United States v. Clerkley*, 556 F.2d 709, 714 (4th Cir. 1977)).

The government has never been required to show that other investigative methods have been wholly unsuccessful or that it has exhausted "*all* possible alternatives to wiretapping." *Smith*, 31 F.3d at 1297 (emphasis in original); *Clerkley*, 556 F.2d at 709. Rather, the language of section 2518(1)(c) is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Kahn*, 415 U.S. at 153, n.12 (1974). At the same time, the purpose of the exhaustion requirement "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Pacheco*, 489 F.2d 554, 565 (5th Cir. 1974). Nor does a wiretap need to be used only as a last resort. *United States v. Kerrigan*, 514 F.2d 35,

38 (9th Cir. 1975).

Courts have also held that, in assessing the need for a wiretap, affiants are authorized to rely upon, and courts are entitled to consider, their knowledge, training and experience as to whether a particular investigative technique will fail. *See Smith*, 31 F.3d at 1299 (issuing court may take into account affirmations which are founded in part on experience of specially trained agents). Furthermore, it is permissible for affiants to opine as to whether a particular procedure will succeed or fail. *Clerkley*, 556 F.2d at 715 (reasonable conclusions about the productivity of certain techniques were sufficient to show need).

Similarly, while the necessity determination may not rely *entirely* on boilerplate language, the fact that affidavits include assertions about some traditional investigative procedures that *are* boilerplate does not preclude the finding of necessity. *See United States v. Milton*, 153 F.3d 891, 895 (8th Cir. 1998). Narcotics investigations in particular, like the one here, suffer from common investigatory problems that lead to permissible boilerplate language in a wire affidavit. Courts applying a commonsense approach recognize that experienced agents repeatedly run into the same problems in these types of investigations, and so necessity recitations that appear to be boilerplate more likely reflect the reality of the type of investigations rather than canned responses.

As the Ninth Circuit has noted in similar circumstances, "we have consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of main coconspirators, but not to apprehension and prosecution of suppliers, major buyers or other satellite conspirators." *United States v. Torres*, 908 F.2d 1417, 1422 (9th Cir. 1990). Similarly, in *Clerkley*, the Fourth Circuit held that even where there was probable cause to arrest four of the principals named in the wiretap orders, the government was not precluded from carrying the investigation further. *Clerkley*, 556 F.2d at 714.

As discussed below, this case involved a narcotics investigation and contained many of the attributes of such investigations: unidentified accomplices, stash locations, meeting locations, possible presence of firearms, and a myriad of other investigative points that could only be discovered via a wiretap authorization.  Here, the defendants do not, and cannot, point to a probable cause deficiency in any of the wire applications and affidavits at issue in this case.  As such, the wiretap applications complied with every requirement of the law.  The government will address each individual affidavit in turn as it relates to the motions.

**B.      Application for Target Telephones 1, 2 and 3 – White, Collins and Morris**

Prior to the authorization of the wiretap, the investigation began in July 2018 and four controlled buys were conducted with confidential sources (CS) and four undercover officers from the Montford DTO.   An additional three controlled buys were conducted with CS and one undercover officer from the OTM DTO.   Based on these controlled buys, the CS provided the number for Target Telephone 1 – later investigators identified Keon White as the user of this phone.   Additionally, undercover officers conducted controlled buys with Keizye Collins, later identified as the user of Target Telephone 2.   At that time of the initial authorization, investigators believed that Collins utilized both Target Telephones 2 and 3, but later learned during the investigation that Morris utilized Target Telephone 3.   As such, on August 20, 2018, Chief Judge Bredar authorized the interception of Target Telephones 1, 2 and 3.[14]

The affidavit provided a phone records/toll analysis that corroborated the phones' ongoing use in support of drug-trafficking activities.  *See* Ex. 1 ¶ 70 -82 *et. seq.*  The Target Telephones 1 - 3 had a high volume of call activity and many calls were of short duration as well.  *Id.*  The

---

[14] The supporting affidavit for the first wiretap authorization in Support of Interception of Target Telephones 1-3 is attached as Exhibit 1.

records of this ongoing usage, combined with the previous information that the phones had in fact

been used for drug-trafficking activities, left no doubt that the phones were drug-trafficking

phones, that the users of these phones had committed and was committing federal narcotics

offenses, and that communications concerning federal narcotics offenses would be obtained

through the interception and monitoring of the target telephones. *See* 18 U.S.C. § 2518(a), (b).

Finally, the affidavit provided a thorough analysis as to why the wiretap was necessary,

that is why other investigative procedures had been tried or appeared unlikely to succeed.  18

U.S.C. § 2518(d).  The investigators had conducted a lengthy investigation prior to seeking a

wiretap, and had attempted or considered a range of other investigative techniques:

Confidential sources had been considered. *See* Ex. 1 ¶ 84-85.  At the time, investigators

successfully employed four different confidential sources (CS-1, CS-2, CS-3 and CS-4).  In fact,

CS-2, in particular, purchased drugs from some of the street-level dealers of the organizations, but

given CS-2's limited connection to the organization (a street-level drug user and purchaser of

drugs), he/she is not in a position to meet any of the higher-ups in the organization. *Id.* ¶ 84.

However, confidential sources are inherently limited in their ability to acquire information about

drug organizations.  Additionally, neither now or then, were the confidential sources willing to

testify or make their identities known for fear of retaliation or significant risk to themselves and

their families. *Id.*  Moreover, these sources have not met and likely will be unable to meet all of

the individuals believed to be involved in this investigation and, given their position as drug

purchasers, would likely not be capable of meeting the higher-ups in the organization. *Id.*

Undercover police investigation was considered. *Id.* ¶ 86-88.  Again, that posed

limitations, as a practical matter, undercover operatives were not always able to penetrate far into

a drug organization's supply chain.  *Id.*  While the undercover squad purchased both heroin and crack cocaine from several of the target subjects and these purchases provided valuable evidence toward a successful prosecution of the DTOs, alone they cannot accomplish the goals of this investigation.  *Id.*  Moreover, undercover operations were not always able to identify the locations of stash points, other associates, suppliers, and so forth.  *Id.* ¶ 87.

Physical surveillance was considered.  *Id.* ¶ 89 -93.  The affidavit laid out specific instances of surveillance efforts.  That surveillance had revealed that lookouts for police were used in the area.  For example, during a controlled purchase, there were males utilizing bicycles as lookouts. *Id.* ¶91.  The obvious reality, of course, is that surveillance could only go so far.  Moreover, in the absence of wiretap information, investigators had no way of knowing in advance, merely from surveillance, when or where drug deals were happening.  Wiretap monitoring, on the other hand, can provide law enforcement with the knowledge beforehand that a meeting is to take place, and may lead to fruitful physical surveillance.  *Id.* ¶ 93.

The affidavit detailed consideration of a number of other investigative methods.  *Id.* ¶ 94 -99.  Those efforts included pole cameras, CCTV cameras, and other mobile surveillance equipment.  *Id.*  As to the CCTV cameras, they were useful, but the street level dealers working along the Monument Street corridor were also aware of these cameras and would often take precautions to conduct their illegal activity out sight of these cameras. *Id.* ¶ 95. Furthermore, in an effort to supplement these cameras, investigators deployed a covert camera truck in the 2300 block of Jefferson Street on July 31, 2018.  Upon arriving in the area at 4:00 a.m., to deploy the vehicle, investigators found that there were already members of the DTO in the area conducting drug sales. *Id.* ¶ 97. Investigators noticed that the remote wireless connection to the surveillance equipment in the vehicle stopped working and later learned that the vehicle had been significantly damaged.

In reality, it appeared that the suspect(s) attempted to gain entry by prying the door open.  They then broke a softball-sized hole in the passenger side window to gain entry into the cab of the vehicle.  Once inside, the suspect(s) stripped the glovebox and its harness from the dashboard, removed all the fuses, and cut various wires and wire harnesses located behind the bench seat in an attempt to render the vehicle inoperable.  Further investigation revealed that the suspect(s) pried open the exterior steel storage.  *Id.*

The affidavit discussed the use of telephone records and pen registers.  *Id.* ¶ 99-100.  Such methods had been used and were incorporated as part of the request for wiretaps on Target Telephones 1, 2 and 3 (see above).  But that did not mean that mere records would allow for a complete investigation.  Records would show contact between two modes of communication, but once again the usefulness of that information was limited without knowing the *contents* of those communications.  *Id.*  Certainly, investigators made effective use of telephone records information to help establish the target subject's use of the target telephones during their activities; but records alone were not sufficient to advance the case.

Grand jury and witness interviews were considered.  *Id.* ¶ 101 -103.  Limitations included the simple absence of such witnesses, and the inability to secure cooperation from such witnesses even if they could be identified.  *Id.*

Search and arrest warrants were considered.  *Id.* ¶ 104.  Although search warrants could be an effective way to advance an investigation, investigators did not know the location of any particular, useful locations to search at the time, other than the OTM Store, which law enforcement has already executed multiple state search warrants none of which curtailed their drug trafficking activities or reduce the violence in the area.  *Id.*

Trash runs were discussed as an option. *Id.* ¶ 105. Investigators had considered trash runs as a possible investigative technique. *Id.* However, although useful, trash runs would not fully identify this organization and their activities and attempts at same could compromise the investigation. *Id.* Overall, trash runs still only had a marginal possibility of revealing useful information about the case. *Id.*

Here, the initial wiretap affidavit provided sufficient analysis of the goals of the investigation and the various investigative techniques that had been conducted prior, showing the necessity for the authorization. As the investigation continued, investigators identified additional members of the Montford and OTM DTO, but the evidence at that time was insufficient to meet the goals of the investigation. Specifically, the identity of all the members of the organization had not been identified and the sources of supply were still unknown. As such, the need to continue the investigation was warranted.

In sum, the initial affidavit provided abundant probable cause to believe that the target subjects were engaged in drug-trafficking, and that the Montford and OTM DTOs were using the target cellular phones in support of that activity. It also established "exhaustion" of other methods and the "necessity" of the requested wiretaps.

### C.    Application for Target Telephones 4 and 5 – Blackston

While Blackston makes no specific argument about the wiretap, he joins the other defendant's pretrial motions and seek to suppress the wiretap in its entirety claiming the affidavits lacked probable cause. (ECF 503). Adams seeks to suppress all communications over Target Telephone 7 on the grounds that the communications were unlawfully intercepted and that the orders of authorization and approval were insufficient. (ECF 485). Contrary to Blackston and Adams arguments, as with the previous affidavits, the September 5, 2018 and later the September

17, 2018 and October 1, 2018 affidavits set forth overwhelming evidence of Blackston's use of Target Telephones 4, 5 and 7 and his drug trafficking activities. Each of these applications will be discussed in turn below.

On September 5, 2018, Chief Judge Bredar authorized the interception of wire communications occurring over Target Telephone 4, but unfortunately Blackston stopped utilizing Target Telephone 4 prior to interception.[15]  However, the affidavit also described Blackston's involvement in the conspiracy's drug activities, and his use of Target Telephone 4 in furtherance of those activities.   Additionally, the affidavit provided phone records/toll analysis that corroborated the phones' ongoing use in support of drug-trafficking activities.  *See* Ex. 2 ¶¶ 36 - 40 *et seq.*  Furthermore, the affidavit also set forth why wiretap investigation was necessary and why other investigative means had been exhausted or would have been futile.  The facts and circumstances were similar to the previous affidavits, and addressed confidential sources, undercover efforts, physical surveillance, methods like CCTV cameras, GPS trackers, toll analysis, grand jury and witness interviews, search warrants, trash runs, prior wiretaps, and jail calls.  *Id.* ¶¶ 41-64.  Those efforts had varying degrees of usefulness, but none were as effective as continuing to monitor the conspiracy's activities through wiretaps.

On September 17, 2018, Chief Judge Bredar authorized the continued interception of Target Telephones 1, 2 and interception of Target Telephone 5 (Blackston) and Target Telephone 6 (Morris).[16]  Certainly Blackston's phone use for drug activity was continuing.  Examples of Blackston's drug-related calls on the phone included, on September 3, 2018, Blackston was

---

[15] The supporting affidavit in Support of Interception of Target Telephone 4 is attached as Exhibit 2.

[16] The supporting affidavit in support of continued interception of Target Telephone 1, 2 and initial interception of Target Telephones 5-6 is attached as Exhibit 3.

intercepted talking to Collins (Target Telephone 2) and Blackston asked Collins about the status of the CDS sales, "How the fuck you ain't done yo?" and Collins said, "I'm on Monument, I been out all morning." See Ex. 3 ¶ 91.  The conversation continued about the amount of sales that Collins was handling on Monument Street at Papa Palace.  Collins and Blackston were intercepted again on September 7, 2018 and Blackston was attempting to collect the drug sales from the day, "Yo, I coulda, I just said I was going to give the money to Man, but yo said he wasn't standing…" ¶¶ 93-94.  Later that same day, Blackston told Collins, "…N---a don't hustle the way you hustle my n—er.  N---gers trap…You holding n---ers up Collins." *Id.* ¶ 96.  Collins answered, "Alright, when I give you the money you ain't got to give me nothing, that's cool bra." *Id.* Blackston went on to say to Collins that "You held the whole entire Rockfeller" (believed to be the brand name of the heroin sold at the drug shop). *Id.* ¶ 97.

Some additional examples of intercepted calls between Blackston and his associate made during the course of the authorized wiretap are as follows:

- On September 13, 2018, based on intercepted calls between Target Telephone 2 (Collins) and Target Telephone 5 (Blackston), investigators conducted surveillance in the 800 block of N. Port Street. Blackston informed Collins that "we ready be back . . . on Monument" where they would later meet to exchange drugs.
- On October 3, 2018, investigators intercepted a call between Blackston and Noah Walston, another member of the OTM DTO. Walston asked Blackston if he "still got a bunch out there" and Blackston replied that they are "bout to be gone" and that once he receives "the bread," then he will give Walston "the bread." Investigators believe this was a call discussing how they were going to split the proceeds from their drug sales once Blackston received the money for the drugs.

Toll analysis for the Target Telephones also provided evidence of their use in drug-related communications.  Blackston's phone Target Telephone 5 showed high call volume and phone contacts with phone numbers that also appeared relevant to the drug investigation.  See Ex. 3 ¶¶ 115-127.

The affidavit also described the agents' attempts at, and exhaustion of, other investigative techniques.   Exhibit 2 at ¶¶ 130 *et seq.*    Confidential sources (including CS-1) had been considered, with the limitations usually attendant to such sources.   *Id.* ¶¶ 133-135.  Undercover investigation was described, noting an undercover's interaction with Morris on August 23, 2018. *Id.* ¶¶ 136-139.  Physical surveillance efforts, including on various specified dates (*Id.* ¶¶ 140-147) were attempted, with some results, but not enough to advance the investigation.   Various other surveillance techniques, such as CCTV were used, but without the context of the intercepts investigators would not know the purpose of the meetings.   *Id.*   ¶¶ 142-143.  The review of telephone records and pen register data was part of the investigation (see above), but did not provide sufficient information.   *Id.* ¶¶ 148-149.   Grand jury and witness interviews were considered, but had similar limitations to those described in the first affidavit.  *Id.* ¶¶ 151-153. Search warrants were considered, *Id.* ¶ 154, but deemed wanting in the absence of reliable information about the locations where the conspiracy operated or stashed drugs.   Trash runs were discussed, again with challenges similar to those discussed in the first affidavit.  *Id.* ¶ 155.  This analysis more than satisfied the wiretap statute's exhaustion/necessity requirements.

On October 1, 2018, Chief Judge Bredar authorized the interception of Target Telephone 7.[17]   As previously indicated, Adams seeks the suppression of communications over Target Telephone 7.

The necessary probable cause for Blackston's continued use of phones for drug trafficking activities had already been established over Target Telephone 4 and then again over Target Telephone 5.   Investigators learned during the course of intercepting Target Telephone 5, that

---

[17] The supporting affidavits in support of the initial interception of Target Telephones 7-9 is attached as Exhibit 4.

Blackston dropped this last phone and started using Target Telephone 7. For example, on September 17, 2018, Blackston using Target Telephone 7 called Collins (Target Telephone 2), and during the call, Blackston asked Collins if he knew who it was and Collins replied, "Sobig you scared bitch," implying that Blackston was scared of law enforcement identifying Target Telephone 5, so he changed his phone. Collins then told Blackston that he was at home and needed a ride and Blackston said he was on his way. Additionally, investigators learned that Blackston's nickname was "sobig." See Ex. 4 ¶¶ 28-29.

As to the communications over Target Telephone 5 and ultimately Target Telephone 7, Blackston talked not only to his associates such as Collins and Adams, but also to drug customers. For example, on September 18, 2018, an unknown male texted Blackston, "Ima need 18 of em" which was coded for eighteen units of drugs. Following that text message Target Telephone 7 and the unknown male exchanged 30 thirty more text messages. *Id.* ¶¶ 36-37. Based upon this information, I believed that during this series of text messages Blackston provided the unknown male his new number Target Telephone 7 and the unknown male told Blackston he was going to delete Target Telephone 5 from his phone. *Id.*

Some additional examples of intercepted calls between Blackston and his associate made during the course of the authorized wiretap are as follows:

- On October 8, 2018, Blackston on Target Telephone 7 talked to an unknown male with the number 443-991-6915. In this call, the unknown male told Blackston to "have seven hundred dollars in the morning" and that he "just had the bitch in my hand," referring to a "glock twenty, ten millimeters." Blackston responded that he wasn't "givin him no more than five fifty for it," indicating Blackston was ready to purchase the gun.

- On October 18, 2018, Adams was recorded talking to Blackston on Target Telephone 7 about arranging a time to purchase drugs. Adams said to Blackston "I got that shit. I got it down here." Later that day, Adams told Blackston that he would

36

"make at least a hundred and something better."[18]

This last example is contrary to the defense's characterizations that these conversations could not "even remotely be described as drug related." (ECF 485 at ¶ 3). Therefore, sufficient probable cause was present for the wiretap that led to the interception of Adams's conversation, as well as Blackston's conversations.   Additionally, prior to intercepting these calls over Target Telephone 7, undercover officers conducted six different controlled purchases between July and September 2018 between Adams and his associates, all resulting in the purchase of either crack, cocaine, tramadol, or fentanyl.   There was no doubt that Adams was engaged in drug trafficking prior to the wiretap, but this becomes even more evident through the intercepted communications, as already discussed in the calls above.   The drug trafficking activity of the Montford and OTM DTOs was prevalent before the wiretap and the intercepted communication further clarified the players and later identified the sources of supply.   In sum, the affidavits in support of Blackston's phones clearly established that he was engaged in drug trafficking, and that he used each of the target cellular phones in support of that activity.   Each also established "exhaustion" of other methods and the "necessity" of the requested wiretaps.

### D.      Application for Target Telephones 3 and 6 – Morris

With respect to Charlton Morris's motion, he seeks to suppress the evidence derived from Target Telephone 3 and Target Telephone 6, the two wiretaps placed on Morris's phones. (ECF 489).  Like the wiretap application already discussed for Target Telephone 3, Target Telephone 6 also clearly demonstrated probable cause to support the authorization.   Target Telephone 6 affidavit detailed the investigation up through the authorization on September 17, 2018.  In fact,

---

[18] Blackston communicated with Adams on several more occasions. This is just one example of many communications between them.

the continued interception of Target Telephone 2 (authorized on September 5, 2020) helped identify another phone utilized by Brian Blackston as Target Telephone 5, as well as Target Telephone 6, a phone utilized by Charlton Morris.  As such, on September 17, 2018, Chief Judge Bredar authorized the continued interception of Target Telephones 1, 2 and interception of 5 and 6.[19]

The first period of monitoring of Keon White (Target Telephone 1), Keizye Collins (Target Telephone 2) and Morris (Target Telephone 3) confirmed that these individuals were involved in drug trafficking.  It also led investigators to identify additional associates, such as Brian Blackston (Target Telephones 4 and 5).  As previously detailed, prior to obtaining these wiretaps, investigators had been conducting physical surveillance of the OTM DTO.  Specifically, on August 20, 2018, investigators used CCTV cameras to conduct physical surveillance and observed Morris use Target Telephone 6 as he talked to investigators, confirming his potential future use of the phone.

The affidavit summarized a number of instances of Morris using Target Telephone 6 for drug-related conversations with Collins (Target Telephone 2) as well as other people.  The affidavits described the coded drug-related conversations between Morris and Collins accompanied by an analysis of the coded language based on the affiant's extensive training and experience.  For example, on August 26, 2018, Morris asked where Collins was, "Where you at yo? And Collins answered, "I'm out yo."  Morris stated, "you done?" and Collins said, "almost yo, I'm almost, I'm still hitting sales dummy. Chill."  Based on the coded language, Morris asked Collins if he was done selling for the shop ("You done?") and Collins stated he still had customers

---

[19] The supporting affidavit in support of continued interception of Target Telephone 1, 2 and initial interception of Target Telephones 5-6 is attached as Exhibit 3.

("I'm almost. I'm still hitting sales.")  *See* Ex. 3 ¶¶ 99-100.  There are several additional calls between Morris and Collins.  During the calls, Collins told Morris he needed another pack "He got em, he got the last couple" (referring to another associate ¶ 107), or when Collins stated to Morris, "Yo, there ain't no rock back there yo" (referring to crack cocaine ¶¶ 108-109) and Morris told Collins where to find the crack, "It's two Cognac packs right there, two Cognac packs right there under them little rocks."  *Id.*

This September 2018 affidavit (Ex. 3) further set forth the probable cause for Morris's phone, Target Telephone 6.  That application, of course, is particularly relevant to Morris's own motion.  As with the other target phone, the affidavit more than satisfied the probable cause requirement for Morris's phone.  During the initial period of interception, investigators intercepted hundreds of calls in which White, Collins and Morris coordinated, directed or planned the operations of the retail drug shop.  The drug-related phone calls between Morris on Target Telephone 3 and between his associates and customers satisfied the probable cause requirement for Target Telephone 6.  On top of those, the affidavit described other calls that provided even more probable cause of Morris's membership in this conspiracy and his use of the target telephone in furtherance of that conspiracy.  Therefore, both Target Telephone 3 and Target Telephone 6 were grounded in sufficient probable cause.

Toll analysis for the Target Telephones also provided evidence of their continuing, frequent use in drug-related communications.  Morris's phone Target Telephone 6 showed high call volume and phone contacts with phone numbers that also appeared relevant to the drug investigation.  *Id.* ¶¶ 124-128.

As already discussed above (Target Telephone 5 – Blackston), the affidavit provided details of the investigation that demonstrated law enforcement officers attempted numerous

39

investigative techniques, but had not been able to fully penetrate the Montford and OTM DTOs and fully identify the sources of supply.  The affidavit described investigators' use of GPS tracking devices, physical location data for cellular phones, successful and unsuccessful attempts of physical surveillance, debriefings of multiple confidential informants, and consensually monitored calls, most of which furthered the investigation, but fell short of achieving the overall goals of the investigation.  The affidavit also describes why other investigative techniques, such as trash pulls, search warrants, interviews, use of undercover officers and grand jury subpoenas, were not used. The wiretap authorization was the culmination of a deliberate, thorough investigation and was necessary to achieve the goals of the investigation.  *See* Ex. 3 ¶¶ 135-155.

As already stated, this analysis more than satisfied the wiretap statute's exhaustion/necessity requirements.

### E.      Application for Target Telephone 9 – Blue

Blue, Crosby, M. Williams and Solomon seek to suppress the wiretap in its entirety claiming the affidavits lacked probable cause.  (ECF 472, 492, 502, 509).  These arguments lack merit for the reasons noted below.

On October 1, 2018, the Judge Bredar authorized the interception of wire and electronic communications occurring over Target Telephones 7 (Blackston), 8 (Noah Walston) and 9 (Blue).[20]  Based on intercepted calls occurring over Target Telephone 7, investigators identified additional phones being utilized by Walston - Target Telephones 8 and 10.  The initial wiretap affidavit for Target Telephone 9 in conjunction with the information investigators gathered prior to the wiretaps on other members of the DTOs provided probable cause for the interception.

---

[20] The supporting affidavit for the initial interception of Target Telephones 7-9 is attached as Exhibit 4.

Following several weeks of interception of Blue's phone, investigators submitted an application to continue monitoring Target Telephone 9 three more times on October 30, 2018,[21] November 29, 2018[22] and December 27, 2018.[23]  The first period of monitoring on Blue's phone confirmed Blue was a drug trafficker and was using this phone.  Additionally, intercepted calls over Target Telephone 9 identified several sources of supply and the identification of Davis an alternate source of supply and trusted confidant.  The three additional affidavits submitted for the continued monitoring of Target Telephone 9 continued to build on details of Blue's drug trafficking activities and highlighted several intercepted calls between co-conspirators and Blue's customers. However, given the fact that the defendants' seek suppression of the October 1 affidavit, which presumably, if suppressed, would effectively suppress the other affidavits associated with Target Telephone 9.  As such, the details of the other affidavits will not be discussed, but it should be clear that probable cause did exist for each and every application submitted to Chief Judge Bredar and the necessary probable cause requirements, as well as the exhaustion and necessity were met each and every time.

The October 1 affidavit summarized a number of other instances of Blue using Target Telephone 9 for drug-related conversations, with Morris a member of the OTM DTO and customer of Blue.  For example, on September 21, 2018, Morris and Blue talked several times Target Telephone 6 and Target Telephone 9.  In one call, Morris said "I'm at the trap," a reference to the location where drugs were kept. Blue informed Morris to meet him "down Montford and

---

[21] The supporting affidavit for the continued interception of Target Telephones 7 and 9 and the initial interception of Target Telephones 10-12 is attached as Exhibit 5.

[22] The supporting affidavit for the continued interception of Target Telephones 9, 12-13 and the initial interception of Target Telephones 14 is attached as Exhibit 6.

[23] The supporting affidavit for the continued interception of Target Telephones 9, 12-14 is attached Exhibit 7.

Monument real fast" where they would exchange drugs.  Based on CCTV surveillance cameras, that same day, Morris was observed meeting with Blue, corroborating his earlier conversation with Blue. *See* Ex. 4 ¶¶ 51- 57.  Overall, investigators believed that Blue was a source of supply for Morris.  Additionally, based on intercepted conversations the previous day, Morris anticipated a new supply of drugs from Blue.  Based on the series of communications on September 21, 2018, investigators believed Blue wanted to meet Morris in person to either provide the new supply of drugs or discuss in person when the new supply would be available.   Following the final call with Blue, Morris went to the Friend Zone Variety Store to purchase drug packaging material and waited for Blue inside of 2300 Madison Street.  A short time later, Blue returned and met Morris who entered Blue's vehicle, only long enough to receive the drugs from Blue before exiting and walking in the direction of 800 North Montford, which was identified during this investigation as a stash house utilized by the OTM DTO. Morris then returned to 2300 Madison to retrieve the black bag from the variety store and returned to the 800 block of North Bradford.

The affidavit provided a phone records/toll analysis that corroborated the phones' ongoing use in support of drug-trafficking activities.  *See* Ex. 4 ¶ 58 -72 *et. seq.*  The Target Telephones 7, 8, 9 had a high volume of call activity and many calls were of short duration as well.  *Id.*  Toll analysis for the Target Telephones also provided evidence of their continuing, frequent use in drug-related communications.  As to Blue's phone, Target Telephone 9, showed call usage and high call frequency, consistent with drug trafficking.  *Id.* ¶ ¶ 68-72.

The initial affidavit for Target Telephones 7, 8, 9 also established the necessity for the wiretap, and the exhaustion of other investigative techniques, with an inventory of previous or ongoing investigative efforts.  As before, the affidavit established that the DEA and BPD had made a robust effort to advance their investigation through various means.  *Id.* ¶¶ 73-99.   The

42

investigators had utilized confidential sources, undercover officers conducting controlled purchases, and physical surveillance, all of which furthered the investigation but fell short of achieving the ultimate goal of the investigation.   Prior to the wiretap of Target Telephone 9, investigators had begun to identify the members of the two drug shops but were still unable to identify their suppliers. The wiretap authorization came after a deliberate, thorough investigation was done and was necessary to further its goals.

Cooperating informants were discussed.  *Id.* ¶¶ 73-78.  The continuing challenge was that it was unlikely that informants would be able to penetrate the organization with substantial success, and also that there were good reasons to believe that overly aggressive efforts to use informants might lead to informants being endangered.  Confidential sources had been able to make controlled purchases from the organization, but it was unlikely they would be able to do more than that.

Undercover operations were also discussed in the affidavit.  *Id.* ¶¶ 79-82.  The undercover ("UC") usage posed similar problems to what had been discussed in earlier affidavits, such as the inability to penetrate the organization to identify its leaders and/or sources of supply.  *Id.* ¶ 80. Furthermore, on August 23, 2018, a UC contacted Morris on Target Telephone 3**,** and arranged a meeting to purchase heroin.  Morris instructed the UC to meet him in the 900 block of North Bradford Street.  When the UC arrived, Morris would not let UC exit his/her vehicle, and stood outside of the UC's vehicle and intentionally stood in a way where he could not be captured on video due to this in fear of an undercover officer.  *Id.* ¶ 81.

Physical surveillance was discussed.  The affidavit laid out the numerous instances of physical surveillance that had been done in the case, and there is no question that the agents made numerous and regular efforts to actually observe the activities of Montford and OTM DTOs, as well as Blue.  *Id.* ¶¶ 83-85.  Physical surveillance was still challenging however, in part because

of the layout of the Monument Street corridor, which made surveillance difficult (*Id.* ¶ 84), and also because the reality of drug investigations was that surveillance would not tell a complete story unless it was joined with details about what the conspirators were talking out.   Additionally, investigators learned during the investigation that the OTM DTO utilized several storefronts along the Monument Street corridor to conceal their illegal activities.   A few of the storefronts utilized by the DTO were Papa's Pizza, Wingstown and J.J.'s Carryout.   Agents spoke with the officers who worked this area on a daily basis, and learned that the video cameras in the lobby of Wingstown was not secured by a cover, and when members of the OTM DTO would enter the store they would reach up and turn the camera to avoid being recorded.  *Id.* ¶ 85.

The affidavit discussed other surveillance methods, such as CCTV cameras, pole cameras and other installed surveillance camera.   *Id.* ¶¶ 86-91.   Investigators used successfully the CCTV cameras to conduct surveillance which did generated useful evidence about the conspiracy. However, the information that can be gained by the covert cameras is limited.   Two separate incidents are discussed in which CCTV camera footage was helpful.   Specifically, on September 17, 2018, at approximately 5:00 p.m., for example, agents used CCTV camera in and around the intersection of North Port Street and East Monument Street, Baltimore, Maryland. *Id.* ¶ 87. During this time investigators observed Malik Williams a/k/a "Freaky" ("M. Williams"), standing on the corner with other OTM members and placed a call to cellular telephone 443-676-2165, a phone believed to be utilized by M. Williams.  *Id.* ¶ 88.  M. Williams was observed on camera answering the phone, although he never spoke he just held the phone to his face and listened.  *Id.* The agent continued to watch M. Williams on the CCTV cameras, the call was disconnected and M. Williams removed the phone from his face and looked at the screen. M. Williams would eventually place the phone back in his pocket and continue interacting with the other OTM

44

members.  *Id.*

In the second example, investigators used CCTV on September 17, 2018 to conduct surveillance of Morris.  *Id.* ¶ 89-90.   At approximately 7:20 p.m., investigators observed Morris entering the 800 block of North Bradford Street. *Id.*  Morris entered the rear alley of the 2300 block of East Madison Street.  Due to the location of the cameras, investigators could not observe Morris after he entered the alley.  *Id.*  Approximately five minutes later, Morris re-entered into the 800 block of Bradford from the rear alley of the 2300 block of East Madison Street and was observed walking eastbound on East Madison Street.  *Id.*  Using the CCTV camera, investigators followed Morris as he walked into the 700 block of North Montford Avenue and appeared to wait for someone.  Moments later, Keiyze Collins, was observed approaching Morris on a bicycle. *Id.* Morris then walked to the eastside of the 700 block of North Montford where two unidentified individuals appeared to be waiting.  *Id.*  Collins quickly met Morris before engaging in what investigators believed to be a hand to hand transaction with the two unidentified individuals.  *Id.* As this occurred, Morris stood with his back turned to them, and scanned the area as if watching for approaching law enforcement as a "look out."  *Id.*  At the completion of the suspected hand to hand transaction, Collins rode away on the bike and Morris followed.  *Id.*  As previously stated, the area the cameras could observe was limited and, obviously, the cameras could provide only limited insight on the nature of conversations or meetings observed. *Id.*

Toll analysis was discussed.  *Id.* ¶¶ 92-93.  As before, mere records were not useful in the absence of detail about the content of conversation.  To be sure, substantial toll analysis had been conducted and was part of the probable cause justification for all of the wiretaps in this case.

The affidavit discussed other methods, such as use of the grand jury or witness interviews, search warrants, and trash runs.  *Id.* ¶¶ 94, 98, 99.  Investigators had considered or pursued such

methods, but none were likely to reveal the inner workings of a secretive drug conspiracy.

   **F.      Application for Target Telephone 12 – Davis**

Like Crosby, Ellison seeks to suppress conversations between them and Egan Davis on Target Telephone 12.  (ECF 496, 480).  With respect to the arguments related to the conversations on Target Telephone 12, the affidavits for Target Telephone 12 demonstrated sufficient probable cause to support the wiretaps and therefore is without merit.

On October 30, 2018, Chief Judge Bredar authorized the wiretap over Target Telephone 12, Egan Davis's phone.[24]  This came after months of undercover controlled purchases and physical surveillance of the two DTOs.  The affidavit for Target Telephone 12 shared similar bases in fact to those found in Target Telephone 9, and as Target Telephone 9 demonstrated sufficient probable cause for its authorization and continuation, so does Target Telephone 12.

In fact, investigators intercepted several calls between Blue and Davis.  Each intercepted communication was, again, accompanied by an analysis of the coded language based on the affiant's extensive training and experience.  For example, on October 2, 2018, Blue and Davis discussed meeting in the area of Collington and Monument (Blue replied, "At the Northeast Market.  Ready to leave out and go and walk right there to my car on Collington and Madison.")  *See* Ex. 5 ¶¶ 128-130.  CCTV cameras confirmed their meetings.  *Id.*  On October 4, 2020, Blue and Davis were intercepted discussing drug trafficking.  Based on the context of this call, investigators believed that neither Blue nor Davis had any CDS available for sale at the time of this call and each was hoping the other had some news about a new supply of CDS, "I thought you was gonna tell me something good."  *Id.* ¶132.  The affiant's interpretation of the coded language

---

[24] The supporting affidavit for the continued interception of Target Telephones 7 and 9 and the initial interception of Target Telephones 10-12 is attached as Exhibit 5.

based on their experience, knowledge and training, was that Davis stopped utilizing a certain source of supply because the provided CDS was diluted and poor quality, "he be doing something to it." *Id.* Based on the conversation, officers believed Blue wanted to wait for a better quality of CDS and noted that if he (Blue) was going to spend money on kilogram quantities of CDS, he (Blue) wanted the kilograms to be untouched and undiluted, "if I'm gonna be on thirty six and thirty six I want mine to be right." Investigators believed "thirty six," was a reference to thirty-six ounces which is the approximately weight of a kilogram. Davis and Blue continued to talk in coded language about Davis not serving as a middle-man on CDS deals that involve diluted CDS because no one he (Davis) knows would want kilogram quantities of CDS that have been diluted unless the price was cheaper, "I can't even middle man none of them cause ain't nobody I know gonna take them joints like that," unless the price comes down, "If you gonna party mix something, at least change the address yo." As such, there was ample evidence to support the authorization of Target Telephone 12.

Toll analysis for the Target Telephones also provided evidence of their continuing, frequent use in drug-related communications. Davis's phone, Target Telephone 12, showed high call volume and phone contacts with phone numbers that also appeared relevant to the drug investigation. *Id.* ¶¶ 153-163.

The affidavit also described the agents' attempts at, and exhaustion of, other investigative techniques. *Id.* ¶¶ 167-169 *et seq.* As described, confidential sources had been considered, with the limitations usually attendant to such sources. *Id.* Undercover investigation was described and discussed the ongoing tension in the neighborhood, highlighted by a non-fatal shooting that occurred on September 29, 2018. *Id.* ¶¶ 170-173. Physical surveillance efforts, including on various specified dates (*Id.* ¶¶ 105-116) were attempted, with some results, but not enough to

advance the investigation.  For example, on October 19, 2018, intercepted a call between Blackston (Target Telephone 7) and an unknown male.  *Id.* ¶ 179.  Based on the context of this call, in conjunction with the GPS location data from Blackston's vehicle, investigators believe Blackston met the unknown male to and UM-0636 met to complete the drug sale.  Various other surveillance techniques, such as CCTV and pole cameras, were considered.  *Id.*  ¶¶ 182-188.  The review of telephone records and pen register data was part of the investigation (see above), but did not provide sufficient information.  *Id.* ¶¶ 189-190.  Grand jury and witness interviews were considered, but had similar limitations to those described in the first affidavit.  *Id.* ¶¶ 191-198. Search warrants were considered, and one was in fact conducted at Derek Crosby's house on October 3, 2018.  *Id.* ¶¶ 199-201.  As a result of the execution of those warrants, and corroborated by intercepted conversations, several of the target subjects were greatly concerned by the arrests of Ricky Davis and Crosby, going so far as to obtain and read the charging documents for both in an effort to assure one another that the arrest was not based on a wiretap investigation.  *Id.* ¶ 200. Trash runs were discussed, again with challenges similar to those discussed in the first affidavit. *Id.* ¶ 202.  This analysis more than satisfied the wiretap statute's exhaustion/necessity requirements.

### G.  Application for Target Telephone 13 – Solomon

Solomon also contests the wiretap attributed to him – Target Telephone 13.  (ECF 509). On November 29, 2018, Chief Judge Bredar authorized the interception of wire and electronic communications over 410-900-2621 (Target Telephone 13) used by Tony Solomon.[25]  There were

---

[25] The supporting affidavit for the continued interception of Target Telephones 9, 12-13 and the initial interception of Target Telephones 14 is attached as Exhibit 6.

five prior wiretaps authorized leading up the November 29, 2018.  As such, the investigation continued to progress and build.  As with the previous affidavits, the November 29, 2018 affidavit set forth overwhelming evidence of the drug trafficking activities of the Montford and OTM DTOs, as well as identified some of the sources of supply, to include Blue and Davis.

Numerous drug-related conversations were intercepted between Blue and Solomon over Target Telephone 9.  For example, on November 2, 2018, Solomon offered to sell Blue two kilograms of cocaine for $72,500, referred to in text as "72.5 square feet."  *See* Ex. 6 ¶¶ 30-31.  Again, Blue and his cohorts used coded language to discuss drugs transactions, quantities, and prices.  On November 3, 2018, Solomon contacted Blue to request the money owed to him (Solomon) for the cocaine provided to Blue on November 2, 2018, "you think we can clear that up tomorrow."  *Id.*  Blue agreed.

On November 7, 2019, based on intercepted calls between Blue and another associate, Egan Davis, investigators conducted surveillance.  Investigators believe Blue bought a kilogram of cocaine from Solomon and then sold the kilogram of cocaine to Davis.  The initial wiretap affidavit for Target Telephone 13 in conjunction with the information investigators gathered prior to the wiretaps on other members of the DTOs provided probable cause for the interception.  The affidavits referred to the type of items the investigators were looking for and referenced the DTOs where drugs were distributed.  This included guns, drugs such as fentanyl, heroin, or cocaine, and various cutting agents such as quinine, caffeine, lidocaine.  As the affidavit makes clear, officers suspected Solomon as a source or supply for Blue and other drug traffickers.  The drug-related conversations and surveillance certainly supported this assertion and provided the necessary probable cause for the requisite authorization.

Toll and records analysis was also conducted for Target Telephone 13 and showed (apart from the content discussed above, which made it quite clear) that the phone had call patterns and volume consistent with being a drug phone.  *See* Ex. 6 ¶¶ 79-85 *et seq.*

Contrary to the defendant's argument, while law enforcement officers utilized a variety of techniques and were successful, the success was limited.  The affidavit clearly set forth why wiretap investigation was necessary and why other investigative means had been exhausted or would have been futile.  The facts and circumstances were similar to the previous affidavits, and addressed confidential sources, undercover efforts, physical surveillance, methods like CCTV cameras, GPS trackers, toll analysis, grand jury and witness interviews, search warrants, trash runs, prior wiretaps, and jail calls.  *Id.* ¶¶ 98-124.  Those efforts had varying degrees of usefulness, but none were as effective as continuing to monitor the conspiracy's activities through wiretaps.  For example, investigators conducted surveillance between Davis and Blue on November 7, 2018, but it was only through the interception of Blue's phone that investigators were able to establish surveillance of the meet.  Although investigators were able to see Davis and Blue meeting, investigators could not overhear what was discussed during the meet and they could not clearly see narcotics being exchanged.  *Id.* ¶ 106.  Therefore, although the surveillance assisted in corroborating evidence gathered from the interception of Blue's phone, the evidence gained from the surveillance by itself was limited.  *Id.*  Additionally, on November 3, 2018, investigators conducted surveillance at 4308 Bedrock Circle, Davis's residence, based on intercepted communications over Davis's phone (Target Telephone 12).  *Id.* ¶ 109.  Here, CCTV alone would have yielded limited evidence of Davis's participation in a suspected drug transaction as the CCTV footage would have lacked context and provided little insight into Davis's activities.  *Id.* ¶ 110.  In the grand jury/witness section several incidences are discussed that highlighted the inability to

successfully use witness information to further the investigation. *Id.* ¶¶ 113-120.

In sum, the wiretap authorization was the culmination of a deliberate, thorough investigation and was necessary to achieve the goals of the investigation. The initial wiretap established overwhelming probable cause for first Target Telephones 1, 2, and 3 and probable cause for the initiation of interceptions over the remaining Target Telephones intercepted during the course of this investigation, including the phones the defendant's complain about and seek suppression.

Each application described the robust investigation that demonstrated the necessity for the wiretap, and the exhaustion of other efforts; and showed that the phones were being used as part of and in furtherance of a drug-trafficking conspiracy. As already discussed, the affidavits were the first step in a six-month long wiretap investigation into the DTOs and their suppliers in the east Baltimore area as well as the surrounding neighborhoods. At the time the affidavits were submitted, investigators were aware that the Montford and OTM DTOs were engaging in drug trafficking activities, however, the investigators were not able to identify all the members involved in the DTO as well as were unable to hone in on their drug shop's suppliers. As a result of the wiretaps, the suppliers have now been brought to light. While the exact wording of the affidavits may have similarities to other wiretap affidavits, when considered in conjunction with the undercover buy operations as well as other particular information investigators knew about the defendant's tendencies, the affidavits for Target Telephones 1 through Target Telephone 18 demonstrated sufficient probable cause to support the wiretaps.

The investigation resulted in a federal indictment charging twenty-five defendants in a drug trafficking conspiracy, among other crimes. Much of the evidence used to obtain the indictment derived directly from the wiretap authorizations. In sum, when the government's wiretap affidavits

are considered as a whole, it is clear that the affiants explained in detail, using case-specific information, how other investigative procedures either had been tried and failed, or reasonably appeared to be unlikely to succeed or to be too dangerous.  *See* 18 U.S.C. § 2518(1)(c), (3)(c). That is all that the necessity requirement demands.  Therefore, the wiretaps were properly authorized, and the motion to suppress should be denied.

### H.    There Was No Violation of the Wiretap Minimization Requirements.

The defendants claim generally that the government failed to comply with the minimization requirements of the federal wiretap statute.  This argument also fails.

Title 18 of the United States Code section 2518(5) contains the minimization requirements for a wiretap and reads, in pertinent part, as follows:

> Every order and extension thereof . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon the attainment of the authorized objective . . . In the event the intercepted communication is in code or a foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.  An interception under this chapter may be conducted in whole or in part by Government personnel, or by an individual operating under a contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception.

The Fourth Circuit has directed courts to consider three principal factors in assessing whether minimization requirements were properly observed: "(1) the nature and scope of the alleged criminal enterprise; (2) the government's reasonable expectation as to the content of, and parties to, the conversations; and (3) the degree of judicial supervision while the wiretap order is being executed."  *Clerkley*, 556 F.2d at 716.  The thoroughness of the government's precautions to bring about minimization and the degree of judicial supervision over the surveillance practices provide strong circumstantial evidence of a reasonable effort to minimize interception of innocent

conversation.  *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000); *see also United States v. Carter*, 449 F.3d 1287, 1296-97 (D.C. Cir. 2006) (noting that the prosecutor instructed agents on minimization and reviewed call records for compliance); *United States v. Eiland*, 398 F. Supp.2d 160, 175 (D.D.C. 2005) (citing government's procedures and judicial supervision as factors tending to show government's compliance with minimization requirement).

In this case, excerpts from the initial wiretap contained the following language noted below, Ex. 8 at 1-17 (and each of the subsequent wiretaps contained the same or similar language):[26]

> Title 18, United States Code, Section 2518(5), requires that interception "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." This provision means that you cannot simply intercept all conversations. Instead, you must take precautions to "minimize" the interception of conversations that do not relate to the criminal activity specified in the Court's Order.

> Difficulties arise because one generally does not know whether a conversation relates to criminal activities unless a portion of the conversation is monitored. If the monitoring indicates the conversation is of an innocent nature, it must be "minimized," that is, interception must be terminated. Moreover, a conversation may relate both to criminal and non-criminal activities.

> As the applications and affidavit indicate, there is reason to believe that other individuals may also be involved in the offenses specified above. Until further notice, due to the nature of this investigation, which involves numerous individuals engaged in a conspiracy, the fact that all participants in these crimes have not yet been identified and that personal non-pertinent conversation may be mixed with or precede conversation of a criminal and/or coded nature, all conversations intercepted may be monitored for up to two (2) minutes for the purpose of identifying the parties to the conversation and determining whether said conversation is criminal in nature or constitutes evidence of the offenses under investigation.

---

[26] The minimization memorandum is extensive and provides detailed explanation about what can and cannot be intercepted and recorded. Above are simply excerpts from the minimization memorandum, however, the memorandum is attached in its entirety laying out the minimization requirements. The minimization memorandum for lines 1-3, is attached Exhibit 8.

It is important that security be maintained at the location where the interception is being monitored, to insure the integrity of the recorded conversations. Only authorized federal agents, specially-designated local law enforcement officers, other individuals under contract with the government, other authorized personnel, and the supervising attorneys or an attorney designated by the supervising attorneys, will be allowed in the monitoring post while the interception is in progress. Friends, relatives, and agents and officers not involved in the interception are to be kept out of the location where interception is being monitored. There will be no exceptions to this rule.

Should one of the subjects have a conversation in a foreign or coded language during a time in which no monitor fluent in that language is immediately available, leave the recording machine on and listen to and record the entire conversation. Foreign language conversations intercepted when an interpreter is not immediately available should be reviewed and minimized, using the above guidelines, with the assistance of the interpreter when he/she becomes available. The monitor, with the assistance of the interpreter, should make a separate tape recording, to be treated as an original, of each of the minimized foreign language conversations. Should the monitoring agent be fluent in the language spoken, all of the rules enumerated herein will, of course, be equally as applicable as if the conversation was in English.

You may not listen to any conversations which are protected by a legal privilege. You should be aware of such privileges as attorney-client, clergyman-penitent, physician-patient, psychiatrist- or psychologist-patient, and husband-wife. This section further explained the requirements if privileged communication became known.

*Id.* Therefore, contrary to the defendants' claims, a specific plan for minimization was both stated and ordered.

Even *if* the defense were to point to a call or calls that should have been minimized but were not, the minimization requirement does not leave all innocent communications unheard. The statute requires that unnecessary intrusions are to be reduced as much as possible but efforts at minimization must be reasonable under the circumstances and reviewed on a case-by-case basis when testing compliance. The Fourth Circuit indicated the rule for this circuit in *Clerkley*:

In analyzing a given case, the federal courts have considered three principal factors: (1) the nature and scope of the alleged criminal enterprise; (2) the government's reasonable expectation as to the content of, and parties to, the conversations; and (3) the degree of

54

judicial supervision while the wiretap order is being executed. *Clerkley*, 556 F.2d at 716.

Where, as here, "law enforcement officials are confronted with a large, far flung and ongoing criminal activity involving multiple parties," the Fourth Circuit has held that "they are afforded greater latitude in conducting wiretaps." *Clerkley*, 556 F.2d at 716; *see also United States v. Quintana*, 508 F.2d 867, 874 (7th Cir. 1975) ("Large and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode. This is especially so where, as here, the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of far flung conspirators and to delineate the contours of the conspiracy."); *United States v. Cox*, 462 F.2d 1293, 1300–01 (8th Cir. 1972) ("[W]here as here, the investigation is of an organized criminal conspiracy conversing in a colloquial code, surveillance of most of the telephone calls made during several days does not constitute a failure to minimize simply because in retrospect it can be seen that a substantial portion of them had no evidentiary or investigative value."); *Charles*, 213 F.3d at 22 (observing that, when an investigation involves a drug ring of unknown proportion, "the need to allow latitude to eavesdroppers is close to its zenith"); *United States v. Daly*, 535 F.2d 434, 441 (8th Cir. 1989) (holding that leeway is especially important when "the purpose of the intercept order(s) is to learn the identities of far-flung conspirators and define the reach of the conspiracy, as well as to incriminate the person whose phones are tapped"); *United States v. Earls*, 42 F.3d 1321, 1325 (10th Cir. 1994). While *Clerkley* involved the investigation of illegal gambling, these same factors are applicable in a gang racketeering or narcotics conspiracy. In *Clerkley* the Fourth Circuit observed: When law enforcement officials are confronted with a large, far-flung and on-going criminal activity involving multiple parties, they are afforded greater latitude in conducting wiretaps." *Id.* The Seventh Circuit, in considering a drug conspiracy, held that a [l]arge and

sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode. This is especially so where, as here, the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of far-flung conspirators and to delineate the contours of the conspiracy. *United States v. Quintana*, 508 F.2d 867, 874 (7th Cir. 1975).

> As the Eighth Circuit in *United States v. Cox*, 462 F.2d 1293 (8th Cir. 1972) noted:

> [W]here as here, the investigation is of an organized criminal conspiracy conversing in a colloquial code, surveillance of most of the telephone calls made during several days does not constitute a failure to minimize simply because in retrospect it can be seen that a substantial portion of them had no evidentiary or investigative value.

*Id* at 1300-01.

> Indeed, it is impossible to determine at the outset whether a particular conversation is irrelevant until it has been terminated.  "It is all well and good to say, after the fact, that certain conversations were irrelevant and should have been terminated.  However, monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction a conversation will take."  *United States v. LaGorga*, 336 F. Supp. 190, 196 (W.D. Pa. 1971).

> The thoroughness of the government precautions to bring about minimization, and the degree of judicial supervision over the surveillance practices, are both strong circumstantial evidence of a reasonable effort to minimize interception of innocent conversation.  *See United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000); *see also United States v. Carter*, 449 F.3d 1287, 1296-97 (D.C. Cir. 2006) (noting that the prosecutor instructed agents on minimization and reviewed call records for compliance; *United States v. Eiland*, 398 F. Supp.2d 160, 175 (D.D.C. 2005) (citing governments procedures and judicial supervision as factors tending to show governments compliance with minimization requirement).

In addition, where, as here, conspiracies use "codes and specialized jargon, making criminal conversations more difficult to detect and decipher, there is yet [another] reason for affording investigators some leeway." *United States v. Uribe,* 890 F.2d 554, 557 (1st Cir. 1989); *see also United States v. Sanchez*, 961 F.2d 1169, 1179 (5th Cir. 1992); *Daly,* 535 F.2d at 441. Moreover, because participants in a conspiracy may "often discuss personal and criminal matters in the same conversations," *United States v. Wilson*, 835 F.2d 1440, 1445 (D.C. Cir. 1987), *abrogated on other grounds by Bloate v. United States*, 130 S. Ct. 1345 (2010), it is unreasonable for monitoring agents to cease monitoring every time non-criminal matters are mentioned. *See also United States v. Mansoori*, 304 F.3d 635, 645 (7th Cir. 2002).[27]

Even if there is a failure to properly minimize some calls, the remedy is not suppression of all the intercepted conversations. *See Cox*, 462 F.2d at 1301–02; *United States v. Sisca*, 361 F.Supp. 735, 746–47 (S.D.N.Y. 1973); *United States v. Mainello*, 345 F. Supp. 863, 874–77 (E.D.N.Y. 1972). Rather, the remedy is simply to suppress the portions of any calls identified by the

---

[27] In assessing a defense minimization challenge, courts generally draw a line at the two- or three-minute mark and exclude such short-duration calls from consideration. *See, e.g., United States v. Yarborough*, 527 F.3d 1092, 1098 (10th Cir. 2008) ("[C]onsistent with Supreme Court and Tenth Circuit precedent, in analyzing the reasonableness of the government's minimization efforts, we exclude calls under two minutes."); *United States v. Homick*, 964 F.2d 899, 903 (9th Cir. 1992) (expressing reluctance to conclude that listening to all calls for two minutes or less irrespective of relevance violated minimization requirements); *United States v. Cleveland*, 964 F. Supp. 1073, 1092-94 (E.D. La. 1997) (excluding calls less than three minutes in duration). *See also United States v. Dumes*, 313 F.3d 372, 380 (7th Cir. 2002) ("Following *Scott*, some courts have held that calls less than two minutes do not require minimization. We certainly agree that minimization of short calls is not required."); *United States v. Hinton*, 543 F.2d 1002, 1012 (2d Cir. 1976) (monitoring all calls for a maximum of five minutes not unreasonable where interceptees frequently communicated in code and where discussions initially personal often turned later to criminal conduct). The rationale for listening to the first several minutes of a conversation is that "even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed." *Scott v. United States*, 436 U.S. 128, 142 (1978).

defendant that resulted from the failure to properly minimize.  *See id.*

Furthermore, not only were certain minimization protocols followed as just discussed, there was also judicial supervision through Chief Judge Bredar.  With respect to the extent of judicial supervision, [w]here the authorizing judge has required and reviewed ... reports at frequent intervals, a reviewing court may take such supervision through reports into consideration in determining whether a reasonable effort to minimize was attempted.  *United States v. Armocida*, 515 F.2d 29, 44-45 (3rd Cir. 1975) (citing *United States v. James*, 494 F.2d 1007, 1021 (D.C. Cir. 1974)); *see also United States v. Cleveland*, 964 F. Supp. 1073, 1093 (E.D. La. 1997).  In this case, Chief Judge Bredar's orders authorizing the wiretaps required that the Government make periodic reports regarding the progress of the investigation.  *See* 18 U.S.C. 2518(6).  *See* Exhibit 17 (Court Report #1 Bates Wire 0082-98, Exhibit 18 (Court Report #2 Bates Wire 0107-127), and Exhibit 19 (Court Report #3 Bates Wire 0444-471).  As such, the Government submitted periodic reports as required.  These reports, *see e.g.* Exhibits 17-19, advised the judge of statistical data including the total number of activations, the number of pertinent calls, and the number of minimized calls.  *See id.*  The reports also included descriptions of many of the pertinent calls, which provided Chief Judge Bredar with continuing probable cause to support the ongoing interceptions. *Id.*  Every report ended with an authorization for Chief Judge Bredar to sign to confirm his review of the report and his agreement that continued interception was warranted.  Accordingly, the degree to which Chief Judge Bredar supervised these wiretaps should inform the Court's assessment of the Government's reasonable efforts to minimize*.  See Eiland*, 398 F. Supp. 2d at 175.

The defendants do not point to any specific problem with the minimization protocols used in this case or to any specific calls that were not properly minimized, instead relying on a vague

legal claim that there was some deficiency in minimization on the part of the government.  That is simply not the case.  In sum, the thoroughness of the government's precautions to bring about minimization, the degree of judicial supervision over the surveillance practices, and the defendants' failure to identify any specific problems with the minimization protocols (either in concept or in practice) should lead the Court to conclude the minimization requirements were properly met.

### I.  The Good Faith Exception Applies Even if the Affidavits Are Found To Be Invalid.

Finally, it is clear that Chief Judge Bredars' wiretap orders complied with the requirements of the law. As such, the affiants were entitled to rely on the facially valid wiretap orders and the resulting evidence is admissible pursuant to the "good faith" exception of *United States v. Leon*, 468 U.S. 897 (1984).  *Leon* has been applied to admit electronic surveillance evidence.  The Fourth Circuit and other courts have recognized that the *Leon* good faith exception applies in the wiretap context just as it does in the context of search warrants and other court orders. *See United States v. Brewer*, 204 Fed. Appx. 205, 208 (4th Cir. 2006) ("Even if Brewer is correct that the affidavits did not set forth adequate probable cause, or that the exhaustion requirements . . . had not been met, the affiants were entitled to rely on the facially valid wiretap orders pursuant to the good faith exception of *United States v. Leon* . . ."); *United States v. Moore*, 41 F.3d 370, 376–77 (8th Cir. 1995) (applying *Leon* good faith reasoning in wiretap context); *United States v. Errera*, 616 F. Supp. 1145, 1149 (D. Md. 1985) (same); *United States v. Miller*, 50 F. Supp. 3d 717, 729 (D. Md. 2014) (same); *United States v. Ambrosio*, 898 F. Supp. 177, 187 (S.D.N.Y. 1995) (same, citing cases and noting some conflict among the courts).

Under the *Leon* good faith exception, "a court should not suppress the fruits of a search conducted under the authority of a warrant, even a subsequently invalidated warrant, unless a

reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002).  Officers are presumed to have acted in good faith except in certain narrowly defined circumstances: "(1) if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) if the issuing magistrate wholly abandoned his judicial role…(3) if the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) if under the circumstances of the case the warrant is so facially deficient…that the executing officers cannot reasonably presume it to be valid." *United States v. DeQuasie*, 373 F.3d 509, 519–20 (4th Cir. 2004). Recently, this Court has held that where police officials have acted "reasonably and in good faith to comply with the central substantive requirements of the Wiretap Act," suppression is not justified despite minor procedural defects. *United States v. Brunson*, 2020 U.S. App. LEXIS 24230 at 22* (4th Cir. 2020). Suppressing evidence "obtained in objectively reasonable reliance on a subsequently invalidated" affidavit "has only marginal or nonexistent benefits in terms of" deterring intentional wrongdoing under the Fourth Amendment.  *Id.* at 21.  Therefore, even assuming, *arguendo*, that the affidavits were invalid (which they were not), the Court may still receive the evidence under the good faith exception to the exclusionary rule.

## II.   Defendants Tony Solomon (ECF 510/589) and Cheyenne Ellison's (ECF 517) Motion for Severance Should Be Denied.

   Defendants Tony Solomon and Cheyenne Ellison have moved to sever their trials.  Solomon has argued that severance is appropriate in this case because there are substantial parts of the government's case that do not directly implicate him and therefore would cause actual prejudice.

Additionally, on July 13, 2020, Solomon filed another motion for severance (ECF 589), which essentially supplemented his initial argument.  In his recent motion, Solomon argues that joinder of George Drummond and Solomon would be highly prejudicial based on mutually antagonistic defenses at trial.  Ellison's argument is largely boilerplate but argues that severance is appropriate on the basis that his role in this conspiracy is limited to a short period of time.  For the reasons stated below, these motions should be denied.[28]

### A.    Applicable Law

In accordance with Federal Rules of Criminal Procedure 8, the government may "charge a defendant in separate counts with [two] or more offenses if the offenses charged ... are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a).  While not "infinitely elastic," the court should apply Rule 8(a) in a flexible manner and joinder of offenses is appropriate so long as the offenses have a "logical relationship to one another."  *See e.g. United States v. Mouzone*, 687 F.3d 207, 219 (4th Cir. 2012) ("joinder of RICO conspiracy and drug distribution counts were proper because drug distribution was an activity of the RICO conspiracy").  Similarly, the government may charge two or more defendants in the same indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions." Fed. R. Crim. P. 8(b).  The Government has broad discretion in initiating and structuring a prosecution, including the joinder of counts and defendants that qualify under Fed. R. Crim. P. 8. *United States*

---

[28] The government understands that limitations in courtroom capacity given the COVID-19 pandemic and limitation on the number of defendants in a courtroom at one time.  With that in mind, the Government has already divided the defendants into trial groups. We respectfully submit that it would be premature to sever defendants for any other reason now when none of the defendants have put forward valid *legal* reasons why they should be severed.

*v. Smith*, 44 F.3d 1259, 1266 (4th Cir. 1995).

When defendants are properly joined under Federal Rule of Criminal Procedure 8(b), as in this case, severance under Federal Rule of Criminal Procedure 14 is justified "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539 (1993); *See Also United States v. Campbell,* 2020 U.S. App. LEXIS 19663 at 16-17 (4th Cir. 2020) (stating that "generally [courts] adhere to the rule that defendants charged with participation in the same conspiracy are to be tried jointly. And the mere fact that evidence against one or more co-conspirator is stronger or more inflammatory than the evidence against others does not necessarily require severance.  Indeed, a conspirator is liable for all acts and all declarations in furtherance of the conspiracy.")  The party moving for severance must establish that "actual prejudice would result from a joint trial, and not merely that a separate trial would offer a better chance of acquittal." *United States v. Reavis,* 48 F.3d 763, 767 (4th Cir. 1995) (citations and internal quotations omitted), *cert. denied,* 515 U.S. 1151 (1995).  Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief, if any, to the district court's sound discretion.  *Zafiro*, 506 U.S. at 538.

It is well-settled that there is a preference in the federal system for joint trials of defendants who are indicted together.  *Id.* at 537.  Indeed, the Fourth Circuit has held that "[b]arring special circumstances, . . . the general rule is that defendants indicted together should be tried together for the sake of judicial economy."  *United States v. Rusher*, 966 F.2d 868, 877 (4th Cir.) (internal quotations omitted), *cert. denied*, 506 U.S. 926 (1992).  Specifically, courts have recognized that severance creates an unnecessary burden and inefficiency for the court, the government, and the witnesses, by requiring the presentation of the same case on multiple occasions.  As a result, claims

of potential prejudice generally are addressed through limiting instructions rather than severance. *See Zafiro*, 506 U.S. at 539; *United States v. Hayden,* 85 F.3d 153, 160 (4th Cir. 1996); Fed. R. Evid. 105.  Even if a defendant demonstrates some prejudice from a joint trial, severance is not required. "A district court should grant a severance only if there is a serious risk that joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." *See Zafiro*, 506 U.S. at 539.

Additionally, joinder of defendants is not improper merely because each defendant did not participate in each act of the conspiracy.  *See United States v. Tipton,* 90 F.3d 861, 883 (4th Cir. 1996) (explaining that once the scope of the conspiracy is shown, "one's having come late to or having varied his level of participation in it from time to time puts him in a position no different from that of any co-conspirator who claims to be prejudiced by evidence that goes to the activities of co-conspirators."); *United States v. Akinkoye,* 185 F.3d 192, 197 (4th Cir. 1999) (stating that "defendants charged with participating in the same conspiracy are to be tried jointly); *See Also United States v. Warner,* 498 F.3d 666, 699 (7th Cir. 2007). Coconspirators may also be tried jointly for offenses related to the conspiracy. *See, e.g., United States v. Smith,* 893 F.2d 1573, 1581 (9th Cir. 1990).  Furthermore, a defendant may properly be convicted of conspiracy even though he or she participated on only one occasion and played a minor part.  *United States v. Roberts,* 881 F. 2d 95, 101 (4th Cir. 1989); *United States v. Jones,* 2009 WL 357946 (W.D. Va 2009).  Further, defendants need not know the identities of the other participants. It is enough that each member know that he or she is participating in a joint enterprise.  *See United States v. White,* 519 Fed. Appx. 797, 810 (4th Cir. 2013) (explaining that a conspiracy does not need to have an "identifiable organizational structure," but can simply be a " loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of

a particular drug consumption market."); *See Also United States v. Odom,* 13 F.3d 949, 959 (6th Cir. 1994).

### B.  Defendants were properly joinder under Rule 8

 As an initial matter, it is important to note that the defendants in this case were properly joined pursuant to Federal Rule of Criminal Procedure 8(b).  Specifically, the defendants are both charged in the same drug trafficking conspiracy and therefore plainly "are alleged to have participated in . . . the same series of acts or transactions constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  Indeed, a case involving a single conspiracy is precisely the type of case in which co-conspirators should be tried together, since much of the evidence presented by the government in its case-in-chief will pertain to all defendants.  *See, e.g., Zafiro,* 506 U.S. at 537–38; *United States v. Akinkoye,* 185 F.3d 192, 197 (4th Cir. 1999), *cert. denied,* 528 U.S. 1177 (2000) ("Generally, we adhere to the rule that defendants charged with participation in the same conspiracy are to be tried jointly.").  Accordingly, the presumption in this case is that all of the defendants should be tried together.

### C.  Severance of any Defendant will defeat the purpose of conducting joint trials and only serve to waste government and judicial resources

Severance is also not appropriate for any of the defendants.  There is a strong preference for joint trials as they promote efficiency, avoid inconsistent verdicts, and "play a vital role in the criminal justice system." *Zafiro v. United States*, 506 U.S. 534, 537–38 (1993); *United States v. Medford*, 661 F.3d 746, 753 (4th Cir. 2011) ("there is a presumption in favor of joint trials in cases in which defendants have been indicted together"); *United States v. Medford*, 661 F.3d 746, 753 (4th Cir. 2011) ("there is a presumption in favor of joint trials in cases in which defendants have been indicted together").  "When defendants properly have been joined under Rule 8(b), a district

court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 at 539.

Moreover, the defendants must demonstrate that actual prejudice, not potential prejudice based on speculation, would result from a joint trial. *United States v. Shealey*, 641 F.3d 627, 632-33 (4th Cir. 2011) ("[a] defendant must establish that actual prejudice would result from a joint trial and not merely that a separate trial would offer a better chance of acquittal"); *United States v. Lighty*, 616 F.3d 321, 348 (4th Cir. 2010). Indeed, severance is not appropriate simply because there are differing levels of culpability or that evidence against one defendant is stronger than another. *Brooks*, 957 F.2d at 1145 ("[t]he fact that the evidence against one defendant is stronger than the evidence against other defendants does not in itself justify severance").

In this case, none of the defendants have articulated any actual prejudice that would result from a joint trial and simply pointed to the potential for prejudice based on differing levels of culpability. While differing levels of culpability can lead to prejudicial "spillover" evidence – inflammatory or sensational evidence admitted against one defendant, but not relevant to another – spillover typically occurs only in cases involving a complex set of facts or circumstances where there is "markedly different degrees of culpability." *United States v. Dinkins,* 691 F.3d 358, 368 (4th Cir. 2012).

Here, the motions for severance consist largely of legal boilerplate. None point to any specific evidence that would be admissible against co-defendants at a joint trial but inadmissible as to them. Although both defendants argue that the scope of the conspiracy and different degrees of culpability among the other defendants create a risk of prejudicial spillover and juror confusion, they each fail to establish any actual prejudice from a joint trial. Furthermore, Solomon alleges

that there were several undercover seizures that "do not directly or indirectly implicate Solomon," and so his trial should be severed to avoid the prejudicial evidence. (ECF 510).  However, given that this is a narcotic conspiracy, the undercover purchases fall well within the gambit of the overall conspiracy, and therefore while Solomon was not personally involved in the undercover purchases, the drugs he supplied to the members of the DTO clearly implicate Solomon, since he is alleged to be a source of supply.  Similarly, Ellison alleges that there are "more than a dozen wire taps" that precede information gathered on him, and that his role is so detached from those prior investigations that he should have his trial severed. (ECF 517).  However, Ellison was identified as a middle-man for Egan Davis, another co-conspirator in this case who supplied drugs to members of the Montford DTO and OTM DTO.  While Ellison was not identified in the beginning of the investigation, his role as a middle-man is not diminished in anyway and therefore he should not be severed.  As such, these motions should be denied.

### D.      A Joint Trial Will Not Prevent either Defendant from Receiving a Fair Trial

A district court should grant a severance under Rule 14 only if there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539.  There is no such risk in this case.

As discussed, Solomon is charged with one count of Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846, as well as one count of Possession With Intent to Distribute Cocaine and Heroin in violation of 21 U.S.C. § 841, which carries a sentence up to 20 years, one count of Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c) as well as one count of Possession of a Firearm and Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1).  As to the

66

additional charges, Solomon claims in his most recent argument (ECF 589) that he seeks severance from his co-defendant George Drummond based on an irreconcilable defense *if* Drummond were to take the stand.  However, the Court should not rule on the mere possibility that Drummond may take the stand as a basis for severance.

The evidence in this case will establish that Solomon maintained at least two stash locations used for storing, cutting and packaging controlled dangerous substances with other members of the conspiracy: 1641 N. Spring Street and 3201 Brighton Street, both located in Baltimore, Maryland.  On January 23, 2019 a search and seizure warrant was executed at 3201 Brighton Street, Baltimore, Maryland and investigators recovered a quantity of controlled dangerous substances and a firearm.  It is the Government's contention that Solomon, along with George Drummond, possessed with intent to distribute approximately 147 grams of a mixture containing heroin and fentanyl, 1 large kilo press and one small kilo press, cutting agents and multiple bags of gelatin capsules and one loaded Glock 37 .45 caliber, semi-automatic pistol bearing serial number GAF795 with 8 .45 caliber cartridges.  Drummond was arrested after the search and seizure warrant.  A search warrant was also conducted at Solomon's house on the same date and investigators seized approximately $41,912.00, believed to be drug trafficking proceeds and recovered several pieces of jewelry valued at $283,200.

Solomon seeks to sever his trial from Drummond because he claims that *if* Drummond takes the witness stand in his own defense and testifies about Solomon's culpability, his testimony will implicate Solomon, which ultimately presents an irreconcilable defense. ECF at 3.  Solomon's argument is based on pure speculation and is not supported by any actual prejudice.   As already stated, joinder is proper, especially given that Solomon and Drummond are "alleged to have participated in the same act or transaction, or in the same series of acts or transactions."  Fed. R.

Crim. P. 8(b). Severance of these two defendants would create an unnecessary burden on the Court and would be very inefficient, especially in light of the already difficult scheduling conflicts in place due to the COVID-19 pandemic. If Drummond were to take the stand as Solomon contends, the jury will certainly be able to assess the credibility of Drummond's testimony. As noted in *United States v. Haldeman,* "The jury could have accepted or rejected both. (T)he mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating another have both been held to be insufficient grounds to require separate trials." 559 F.2d, 31, 71 (D.C.Cir. 1976, cert. denied, 431 U.S. 933 (1977) citing U*nited States v. Barber,* 442 F.2d 517, 530 (3d Cir.), cert. denied, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 **295 *72 (1971). Additionally, the rule seems to require more than finger-pointing, which is exactly what Solomon contends Drummond intends to do. "The presence of conflicting or antagonistic defenses alone does not require severance." *United States v. Najjar*, 300 F.3d 466, 474 (4th Cir. 2002); *See Zafiro*, 506 U.S. at 538, 113 S.Ct. 933. The Court in *Najjar* went on to say*,* "We note that "[t]he mere presence of hostility among defendants ... or a desire of one to exculpate himself by inculpating another [are] insufficient grounds to require separate trials." *Id. at 474, citing United States v. Spitler*, 800 F.2d 1267, 1271 (4th Cir.1986) (internal quotations marks and citation omitted). Moreover, the rule requires more than finger-pointing. There must be such a stark contrast presented by the defenses that the jury is presented with the proposition that to believe the core of one defense it must disbelieve the core of the other. *Id. citing United States v. Romanello*, 726 F.2d 173, 177 (5th Cir.1984), or "that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Becker*, 585 F.2d at 707.

Furthermore, Solomon has failed to establish any actual prejudice and his reliance on speculative claims is without merit. Purely speculative and unsubstantiated assertions "that there

would be evidence admitted against co-defendants that would be inadmissible against [the defendant], and the spillover effect of the evidence" is insufficient to warrant severance. *United States v. Najjar*, 300 F.3d 466, 473 (4th Cir. 2002). Therefore, the Court should further reject Solomon's argument that joinder with Drummond violates his right to a fair trial.

As to Ellison, he worked with Davis who conspired with Solomon and Blue to distribute over 5 kilograms of cocaine, 280 grams of crack, 1 kilogram of heroin, and fentanyl to members of the Montford DTO and OTM DTO, as well as other drug traffickers known and unknown. Although each defendant's culpability might vary in their involvement in the conspiracy: both are alleged to have committed drug trafficking offenses in furtherance of their narcotics conspiracy. The evidence at trial will establish that they were both intimately involved in the DTO's affairs. Overall, the Court should reject the arguments by Solomon and Ellison that they will be prejudiced by evidence of undercover purchases and prior wiretaps.

It is frequently the case that members of a drug trafficking organization play different roles in the conspiracy. Although the defendants may have played different roles in the charged conspiracy, _both_ of them benefitted from the drug trafficking activities in East Baltimore. Any risk of prejudice from perceived differences in the defendants' levels of relative culpability can be resolved by "less drastic measures [than severance], such as limiting instructions." *Zafiro,* 506 U.S. at 539; *see also United States v. Brugman*, 655 F.2d 540, 543 (4th Cir. 1981) ("The language of Rule 8(b) assumes certain evidence may be admitted against one defendant not necessarily applicable to another."); *United States v. Baker,* 10 F.3d 1374, 1388 (9th Cir. 1993) (finding no prejudice despite differences in culpability), *cert. denied,* 513 U.S. 934 (1994); *See also Akinkoye,* 185 F.3d at 197 (holding that there is no right to severance merely "because the evidence against one defendant is not as strong as that against the other") (citing *United States v. Brooks*, 957 F.2d

1138, 1145 (4th Cir.), *cert. denied*, 505 U.S 1228 (1992)).

Moreover, the thrust of the government's case is Count One of the Superseding Indictment, which alleges a drug conspiracy.  Ordinarily, defendants charged in a conspiracy should be tried together and severing defendants charged in the same conspiracy is granted in only rare circumstances.  *United States v. Brooks*, 957 F.2d 1138, 1145 (4th Cir. 1992); *United States v. Nelson*, 2 Fed. Appx. 236, 238 (4th Cir. 2001) ("[g]enerally, defendants who are indicted together should be tried together, particularly when they have been charged with conspiracy").  Each defendant charged in the Superseding Indictment is charged in the drug conspiracy.  Indeed, even if one or several defendants were severed and tried separately, the government's presentation of evidence would likely be the same.  The government is required to prove the existence of the enterprise and acts perpetrated by one member of the enterprise would be admissible against the others, regardless of whether a defendant was tried separately.

Ultimately, the defendants have not demonstrated any actual prejudice and this is precisely the type of case that defendants charged together should be tried together.

### E.   There Are No *Bruton* Problems Requiring Severance

Solomon and Ellison also vaguely contend that severance would be required if the government were to violate the Confrontation Clause of the Sixth Amendment, as construed in *Bruton v. United States,* 391 U.S. 123 (1968).  Under the *Bruton* rule, the government may not offer out-of-court statements of a non-testifying co-defendant during a joint trial, when those statements incriminate the defendant.  *Bruton v. United States*, 391 U.S. 123, (1968); *United States v. Shores*, 33 F.3d 438, 442 (4th Cir. 1994).  Such statements violate the defendant's Sixth Amendment right to confront witnesses against him.  *Id*.  The defendants have not identified any such confessions, and the government does not intend to use any.  To the extent the government

seeks to admit any such confessions, it will do so by calling the confessor to the witness stand.

In any event, the proper remedy for a potential *Bruton* violation is not to sever the trials of the defendants, but instead to edit or redact the testimonial statement in order to eliminate the Confrontation Clause problem.  As the Supreme Court held in *Richardson v. Marsh,* 481 U.S. 200, 211 (1987), the Confrontation Clause is not violated when a non-testifying co-defendant's confession is redacted to eliminate any reference to the other co-defendant's existence.  Moreover, the Supreme Court has specifically held that there is no Sixth Amendment violation unless the confession sought to be introduced contains "facially incriminating statements," rather than merely statements which become incriminating when linked to other evidence.  *Richardson,* 481 U.S. at 208–09; *see also Akinkoye,* 185 F.3d at 197–98 (finding that when a non-testifying co-defendant's statement is redacted and read into evidence such that the statements do not refer to the existence of the defendant, severance is not required).

## III.   Defendants Tony Solomon (ECF 508) Motion to Suppress Statements Should be Denied.

Defendant Tony Solomon have filed motions to suppress various statements they made to law enforcement. *See* ECF 508.  Solomon asserts his general right against self-incrimination under the Fifth Amendment, his right to counsel under the Sixth Amendment, and his right to a hearing to determine the voluntariness of any custodial statement that the government seeks to admit as evidence at trial.  *Id.*  Although Solomon's motion failed to identify *any* particular statement obtained, the government will focus on only the statements during the execution of the search warrant as we are not aware of any other statements made by him.   For the reasons stated below, his statement was voluntary and admissible.  Therefore, his motion should be denied.

### A.  Applicable Law

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In order to protect this right, the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), adopted prophylactic procedural rules that must be followed in custodial interrogations.  *United States v. Parker*, 262 F.3d 415 (4th Cir. 2001).  In general, any statements elicited from a suspect without first advising the suspect of his rights to remain silent and to counsel are inadmissible in the prosecution's case-in-chief.  *Id.* An individual is "in custody" for *Miranda* purposes when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a degree associated with formal arrest."  *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).  "Interrogation" for *Miranda* purposes means "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  On the other hand, "volunteered statements"—that is, statements "given freely and voluntarily without any compelling influences"— "are not barred by the Fifth Amendment and their admissibility is not affected by" the Supreme Court's holding in *Miranda*.  *Miranda*, 384 U.S. at 478.

Statements made after a *Miranda* waiver must also be voluntary.  The Supreme Court has held that "[c]oercive police activity is a necessary predicate to the finding that a confession is not voluntary."  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *see also United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002).  Examples of coercive police activity include prolonged detention and interrogation without sleep or rest, administration of "truth serums," physical abuse, and threats of physical abuse.  *See Cristobal*, 293 F.3d at 140.  "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary."  *United States v. Braxton*, 112 F.3d 777, 780

(4th Cir. 1997) (en banc). Rather, "[t]he proper inquiry 'is whether the defendant's will has been 'overborne" or his 'capacity for self-determination critically impaired'" by police conduct. *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)); *see also Braxton*, 112 F.3d at 780. In applying this test, "courts must consider the 'totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the interrogation.'" *Braxton*, 112 F.3d at 780 (quoting *Pelton*, 835 F.2d at 1071). Ordinarily, courts do not suppress post-Miranda statements unless they are "coerced confessions procured by means 'so offensive to a civilized system of justice that they must be condemned.'" *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (quoting *Miller v. Fenton*, 474 U.S. 104, 109 (1985)).

### B. The Statements Are Admissible

The investigators executed a search and seizure warrant at Solomon's residence. Solomon was present and arrested. After investigators advised Solomon of his *Miranda* rights, he advised that he had a bag inside his bedroom, under the dog bed that contained approximately $20,000.00. Investigators recovered a total of $41,912.00 and recovered several pieces of jewelry valued at $283,200.

The admissibility of the defendant's statements in this case is not a close question. All of the defendant's statements were preceded by a proper *Miranda* advisement and a knowing and voluntary waiver of those rights. The police did not make any threats or promises to induce the defendants to waive their rights. All the statements at issue were voluntarily given. There are no circumstances indicating that any defendant's "will [was] overborne or [that] his capacity for self-determination [was] critically impaired." *Braxton*, 112 F.3d at 780 (quoting *Pelton*, 835 F.2d at 1071). As discussed above, the defendant was legally detained and properly advised of his rights—

73

in most cases, more than once.  At no time did the defendant request that the interview be stopped for any reason.   In this instance, the police were cordial and professional; they did not make threats or promises or otherwise engage in coercive conduct.  *See Connelly*, 479 U.S. at 167 ("[C]oercive police activity is a necessary predicate to the finding that a [statement] is not 'voluntary' within the meaning of the Due Process Clause.").  This is not a case where law enforcement officers "attempted to 'wring[] a confession out of an accused against his will,'" *Cristobal*, 293 F.3d at 141 (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206–07 (1960)), or "went to extraordinary lengths to extract from [the defendant] a confession by psychological means," *Braxton*, 112 F.3d at 786 (quoting *Ferguson v. Boyd*, 566 F.2d 873, 877 (4th Cir. 1977) (per curiam)).

Solomon's decision to inform them of the exact location of the money was not occasioned by any improper police conduct, nor does he point to any improper conduct.  The police already had a search and seizure warrant to search the home for narcotics and related items.  Furthermore, this type of inducement by the officer is not the type that renders the defendant's statements involuntary.  *See Braxton*, 112 F.3d at 782; *United States v. Savage,* 161 Fed. App'x. 256 (4th Cir. 2006) (officer's statement that "everyone in the house could be arrested if any guns or illegal narcotics were found" was "not sufficient to render [the defendant's] statement involuntary"); *Mitchell*, 514 F. App'x at 322 (confession voluntary despite officer's statement that the defendant's girlfriend could lose custody of the children permanently unless he claimed responsibility for the drugs and gun in their home).

There is nothing in the defendant's motion that indicate the police exploited their situations in an unjust manner or did not implement the proper safeguards prior to engaging the defendants.  Solomon's responses were coherent and responsive, and his capacity for self-determination was not impaired.   In sum, the custodial interview in this case was routine, benign, and free from

74

improper police influence.  The statements at issue were either preceded by valid *Miranda* waivers or unprompted by illegal police coercion.  And in each case, the totality of the circumstances weighs heavily in favor of a finding of voluntariness.  Accordingly, the defendant's motions should be denied.

## IV.   Motions to Suppress Fruits of Search Warrants Issued under Fed. R. Crim. Pro. 41 – Daniel Blue (ECF 474), Crosby (ECF 491, 506, 513)

### A.  Applicable Law

A judicial officer's determination that there is probable cause to issue a search warrant is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).  Probable cause means far "less than evidence which would justify condemnation or conviction," *Brinegar v. United States*, 338 U.S. 160, 175 (1949), and even less than that required by the preponderance-of-the-evidence standard, *see Gates*, 462 U.S. at 235; *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) ("[T]he probable cause standard does not require that the officer's belief be more likely true than false.").  Probable cause may be established through information provided by any reliable source or sources, *Draper v. United States*, 358 U.S. 307, 313 (1959), or even through an anonymous tip that has been corroborated, *see Gates*, 462 U.S. at 241.

The Fourth Circuit has held "that the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence."  *United States v. Servance*, 394 F.3d 222, 230 (4th Cir.), *vacated on other grounds*, 544 U.S. 1047 (2005).  Thus, warrants are to be upheld "even when the affidavit

supporting the warrant contains no factual assertions directly linking the items sought" to the place to be searched.  *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005).

The statement of probable cause need not be written with "[t]echnical elaborate specificity," *United States v. Ventresca*, 380 U.S. 102, 108 (1965), and a "magistrate has the authority … to draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant," *Bynum*, 293 F.3d at 197.  "Because probable cause is evaluated through a totality-of-the-circumstances analysis rooted in common sense," a reviewing court should give "great deference" to an issuing judicial officer's decision to issue a warrant based on the facts before him.  *Montieth*, 662 F.3d at 664.

### B.  The Warrants Were Supported by Probable Cause

Blue's motion only generally attacks the affidavits in support of this warrant, vaguely arguing that the magistrate was misled by false information in the affidavit and abandoned its detached and neutral judicial role. Blue claims that the warrant lacked probable cause, was facially deficient, and that the officers exceeded the scope of their warrant.  ECF 474.   For the reasons discussed below, the evidence was lawfully obtained, and Blue's motion to suppress should be denied.

#### 1.  *Execution of Search Warrant on January 4, 2019 at Blue's Residence (ECF 474)*

The search warrant, which was issued by U.S. Magistrate Judge Stephanie A. Gallagher, Ex. 9, was valid and supported by probable cause.  On January 8, 2019, investigators executed a search and seizure warrant at Blue's residence located at 1202 Roxboro Road, Rosedale Maryland.[29]   During the search, Blue was the only one home, and he was advised of his Miranda

---

[29] The search warrant for the location of 1202 Roxboro Road, Rosedale Maryland is attached as

rights.  Investigators recovered 3 cell phones, a Taurus .45 caliber LC/410-gauge HG with 3 410-gauge shells under the basement stairs in a bag, 2 watches, Louis Vuitton and Rolex, Kahr .45 caliber HG with 5 rounds in the family room couch pillow, knotted plastic bag with ½ ounce powder substance confirmed non-CDS in the kitchen cabinet, and $45,817.  Additionally, during the search warrant, investigators called Target Telephone 9, Blue's phone, and Target Telephone 9 rang.  This confirmed that Blue was in possession of Target Telephone 9, the phone that was intercepted during the course of the investigation.

The warrant was facially valid and established probable cause to believe that evidence of the crimes of drug trafficking conspiracy would be found in the premises. The warrant was executed nearly six months into a ten-month long wiretap investigation into the Montford and OTM DTOs.  At this point, investigators had gathered hundreds of phone calls and messages between participants in both DTOs, which included drug-related conversations involving Blue. Ex. 9 at 5-18.  Additionally, investigators conducted physical surveillance as well as monitored the GPS tracker on both of Blue's vehicles and believed that Blue was engaging in drug trafficking activity at his residence.  *Id.* at 10-11, 19-22.  The search warrant provided details about both intercepted communications as well as surveillance where Blue met with a drug customer after leaving his house – 1202 Roxboro Road.  *Id.* at 10-11.

Based on the totality of the circumstances, there was probable cause to believe that Blue was involved in drug trafficking, and that evidence of that crime would be found in the target residence.  The affiant set forth his extensive experience in drug trafficking investigations, transcribed the relevant portions of the wiretap calls, and explained in detail why he interpreted

---

Exhibit 9.

the coded language in the calls the way he did.  Furthermore, Blue does not point to any specific

issue with the affidavits in support of the warrant, nor how the information provided in the warrant

was false or misled the magistrate in anyway.  The search warrant was clearly supported by

probable cause and provided the exact locations to be searched, therefore, the search warrant was

not facially deficient.  In sum, Blue's argument fails to justify provide any basis for suppression a

there was certainly a substantial basis for Judge Gallagher to determine that the warrant should be

issued.  As such, this motion should be denied.

### 2.   *The search of Crosby's property on 631 Saint Anns Avenue (ECF 491)*

Crosby has moved to suppress evidence recovered pursuant to a state search warrant

executed at 631 Saint Anns Avenue on October 3, 2018.  The search warrant was signed by Judge

Cooper of the District Court of Maryland for Baltimore City on October 3, 2018.[30]  Crosby claims

that the warrant lacked probable cause because it fails to lead a "man of reasonable caution" to

believe that evidence of a crime would be found.  ECF 491, at 2.  The defendant argues that the

affidavit does not support a showing of probable cause because the affidavit focused largely on

Ricky Davis and his colleagues in the 600 block of N Duncan Street in Baltimore.  *Id.* The

defendant continues to say that the surveillance of Mr. Davis did not incriminate Mr. Crosby as

they did not interact on Saint Anns when BPD was tracking Mr. Davis.  *Id.* at 2. This motion

should be denied.

The search warrant was amply supported by probable cause to believe that evidence of

drug trafficking would be found in the subject premise.  The search warrant detailed multiple drug

trafficking activities between Ricky Davis and Gregory Yerby over the course of a month, from

---

[30] The October 3, 2018 search warrant affidavit for the location 631 Saint Anns Avenue is attached
as Exhibit 10.

August 15, 2018 through September 27, 2018.  *See* Ex. 10 at 9-19.  The search warrant further discussed that Davis was tracked via a GPS tracking device on his silver Lexus which entered the area of the 600 block of Saint Anns Avenue on at least six occasions.  *Id.* at 19-20.  The search warrant further noted that Crosby lived at 631 Saint Anns Avenue and discussed the observations of Crosby at his house.  *Id.* at 20.  Additionally, the search warrant explained that Crosby and Davis are known acquaintances, and that the dwelling of 631 Saint Anns Avenue was being utilized to store illegal narcotics.  *Id.*

The facts clearly supported probable cause.  "The probable cause is not defined by bright lines and rigid boundaries.  Instead, the standard allows a magistrate to review the facts and circumstances as a whole and make a common sense determination of whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Williams,* 974 F.2d 480, 481 (4th Cir. 1992) *citing Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).  As in the *Williams* case and noted by Crosby, the facts presented to the magistrate need only "warrant a man of reasonable caution" to believe that evidence of a crime will be found.  *Id.*  The probable cause standard "does not demand showing that such a belief be correct or more likely true than false."  *Id.*  Here, contrary to Crosby's position, this warrant did meet the standard.  The judge did exactly as required, and exercised "reasonable caution" when he authorized the officers to search 631 Saint Anns Avenue based on the totality of the facts presented and the belief that evidence of drug trafficking would be found at the location.  The affidavit provided sufficient facts to establish probable cause and therefore, the defendant's motion should be denied.

### 3.   *The search of Crosby's property on 1741 North Dallas Street (ECF 506)*

Crosby argues (1) that the affidavit relies on illegally seized information, specifically that the affidavit relies on wiretap interceptions from Target Telephone 9 (Blue) and Target Telephone 12 (Davis), (2) that regardless if the intercepts were legal, the conversations were vague and failed to provide the necessary probable cause, (3) that the information provided by the two informants fails to support probable cause, and (4) finally that the affiant's allegation that Crosby was at Dallas Street for an illegal purpose is speculative. ECF 506 at 2.

The search warrant, which was issued by U.S. Magistrate Judge A. David Copperthite, Ex. 11, was valid and supported by probable cause.[31]   On June 19, 2019, investigators received a warrant to search Crosby's residence, 631 Saint Anns Avenue, as well as property on 1741 North Dallas Street, identified as a stash house. The affidavit relies on Target Telephone 9 interceptions between Crosby and Blue, Target Telephone 12 interceptions between Crosby and Egan Davis, confidential source information and a source of information as well as surveillance earlier in the day just prior to the execution of search and seizure warrant.

Prior to executing the search warrants related to Crosby and Lewis, investigators conducted pre-raid surveillance. On June 19, 2019, investigators conducted surveillance at 405 Collington Avenue, which investigators identified during the wiretap investigation as a location where Crosby would meet Blue or Davis to conduct drug transactions. Below is the timeline of events:

- 10:59 a.m., investigators observed an unidentified white male exit the Collington location while carrying a bag. The unidentified male went out of camera view before returning moments later and re-entered the Collington location, still carrying the bag.
- 2:25 p.m., the surveillance team observed Crosby arrive at the 1741 Dallas Street

---

[31] The search and seizure warrant for 631 Saint Anns Avenue, Baltimore, Maryland and 1741 N. Dallas Street is attached as Exhibit 11. Investigators also executed search warrants connected to Crosby at 631 Saint Anns Avenue and recovered suspected cutting agents as well as a stolen firearm from his vehicle.

location operating the Ford pickup truck (registered to Crosby).  Crosby exited the vehicle and entered the Dallas Street location through the alley while carrying a bag.

- 2:23 p.m., the surveillance team observed Crosby and Lewis, exit the Dallas Street location carrying a large black bag.  Crosby placed the bag into the rear of the Ford truck and left the area.  Lewis re-entered his residence.
- Investigators then followed Crosby as he drove to his residence located at 631 Saint Anns Avenue.  Based on information learned from the CS-1 and SOI, investigators believed Crosby was transporting the CDS to his residence from Dallas Street.
- 8:20 p.m., investigators arrested Crosby on the arrest warrant issued as a result of the June 11, 2019 Indictment.

Immediately following Crosby's arrest, investigators executed a search and seizure warrant at 1741 Dallas Street.  The house is owned by Derrek Crosby and is believed to be a stash location for Crosby.   Agents arrested Lewis and seized from 1741 Dallas Street approximately 677 grams of heroin/fentanyl, cutting agents, various packaging materials, and cocaine packaged for street level sales as well as 11.7 grams of fentanyl on Lewis's person, and Lewis's phone.

There is no question that the police had probable cause to believe that evidence of drug trafficking would be found and the premise.  Furthermore, there was certainly a substantial basis for Judge Copperthite to determine that the warrant should be issued.  As discussed above in section 1(a), the wiretap interceptions for Target Telephone 9 and Target Telephone 12 were lawfully authorized and contrary to Crosby's argument were not vague and did provide clear examples of drug trafficking activity between Crosby and his co-conspirators.  Exhibit 11 at 6-9. For example, on November 13, 2018, after investigators intercepted calls and text messages between Crosby and Blue (Target Telephone 9), investigators conducted surveillance at 602 N. Potomac Street, identified as Blue's mothers residence.  During the surveillance, and based on additional calls, investigators observed Crosby park in front of 602 N. Potomac Street and meet with Blue.  Investigators observed Crosby's left front pants pocket weighted down, believed to be money to pay for drugs based on the previously intercepted call on November 12, 2018 ("I need

one of them tickets"). On November 13, 2018, after investigators intercepted Crosby and Blue (Target Telephone 9), investigators conducted surveillance at 602 N. Potomac Street, identified as Blue's mother's residence. These calls are certainly not vague and are coupled with the surveillance which corroborated the intercepted calls and clearly demonstrate that Blue and Crosby were engaging in drug trafficking activity. Not only did the affidavit provide details of Crosby's drug trafficking activity, but it also detailed Crosby's drug trafficking activity with Egan Davis, who was identified as a source of supply for drug traffickers. *Id.* at 11-12. For example, on November 16, 2018, Crosby called Davis to purchase CDS, as well as inquire into the quality of the CDS, "I need to check one of them out man, I need to check, that free phone out...." and "…Let me check both of them out yo! Im going to check both of them out…." Additionally, investigators believe Crosby and Davis agreed to meet to conduct the CDS transaction. Again, these intercepted calls clearly support that Crosby was engaging in drug trafficking activity.

The defendant also argues that the informant's information is insufficient to support probable cause. ECF 506 at 2. However, the affidavit provides sufficient details about the confidential source and source of information, which investigators corroborated. See Exhibit 11 at 12-14. Therefore, the information provided by the informants further supported probable cause noted in the affidavit. Finally, the pre-raid surveillance, coupled with all the other information provided in the affidavit, clearly established that Crosby's and Lewis's actions of carrying a bag were based on more than mere speculation. Specifically, Crosby's actions of removing a bag from his vehicle, entering the stash house through the alley, and then Lewis carrying another bag from the stash house to Crosby's vehicle corroborate the information provided by the informants as well as Crosby's drug trafficking activity as a whole. As such, the affidavit was supported by ample probable cause and the evidence recovered during the search at 1741 N. Dallas Street should not

be suppressed.   Ultimately, with all this information in hand, the affidavit contained a plethora of incriminating information on Crosby and the stash location – 1741 N. Dallas Street.  For these reasons, his motion as to this property should be denied.

**V.   Defendant Derek Crosby (ECF 513/514) Motion for a *Franks* Hearing and Motion to Suppress Vehicle Search Should be Denied.**

Defendant Derek Crosby claims that no probable cause existed to search his Acura TLX, and therefore, the stolen firearm recovered during the search should be suppressed.  ECF 513. Crosby also requests a hearing to address whether false or misleading information was included in the search warrant for the Acura sedan belonging to him. ECF 514.  Since Crosby's Motion for a *Franks* Hearing is related to the search of the vehicle, these arguments will be addressed together. For the reasons stated below, both of these motions should be denied.

**A.  The Search of Crosby's Acura TLX Was Valid**

Crosby has moved to suppress evidence recovered during a federal search warrant executed on his vehicle an Acura TLX.  Although there was a valid search warrant, Crosby argues that there was a warrantless search of the vehicle, claiming that there was no probable cause that vehicle contained contraband.  ECF 513 at 1-2.  He further argues (1) that the affidavit was invalid because it lacks probable cause, (2) that the information provided by the two informants fails to support probable cause, and (3) finally that the affidavit fails to offer any details of the "positive alert" of the canine scan. *Id.* at 2-3.

The search warrant, which was issued by U.S. Magistrate Judge A. David Copperthite, Ex. 12, was valid and supported by probable cause.[32]   On June 21, 2019, investigators received a warrant to search Crosby's two vehicles, an Acura TLX, bearing Maryland registration T910985,

---

[32] The search and seizure warrant for Acura TLX is attached as Exhibit 12.

a Ford F-350 and an Apple IPhone device (co-conspirator – Jamaica Lewis's phone).  Only the Acura TLX is at issue here.

As previously discussed, on June 19, 2019, investigators executed a federal search and seizure at the stash house 1741 Dallas Street – owned by Crosby, as well as at his residence, 631 Saint Anns Avenue.  During the search of both locations, two vehicles were identified belonging to Crosby, an Acura TLX and a Ford 350 pickup truck.  The vehicle was transported to the Baltimore District Office parking garage for safe keeping pending the search warrant.  The vehicle was not searched prior to obtaining the search warrant, therefore, Crosby's argument that a warrantless search occurred is moot.

There was substantial probable cause established to search his Acura TLX.  Based on the evidence seized from the search of his stash location, and Crosby's connection to the vehicles, there is no question that the police had probable cause to believe that evidence of drug trafficking or contraband would be found in the vehicle(s).  Both of these vehicles were searched, and investigators recovered a stolen .40 caliber S&W unloaded in a hidden compartment in the center console area of the Acura TLX.

As in the affidavits for the stash location and Crosby's residence, the background of the investigation was laid out as well as the details of the search at both of these locations.  Specifically, the facts supporting probable cause included the following:

- On July 11, 2019 a federal grand jury sitting in the District of Maryland returned indictments against some of the subjects of the investigation, including Crosby.

- Following the Indictment, investigators received information from a confidential course (CS-1) and a source of information (SOI[33]) regarding Crosby, and an

---

[33] SOI has previously provided investigators with information that has been deemed reliable and accurate.  SOI is not being financially compensated for his/her cooperation.

individual known as Jamaica Lewis.  Both CS-1 and the SOI advised that Crosby utilizes the Target Vehicles to conduct the operations of his DTO.

- Details of the pre-raid observations, and ultimately Crosby's arrest to include that Crosby was driving the Ford F-350- noted as Target Vehicle 1. This vehicle was transported to the DEA pending the search warrant.  While awaiting transport, agents observed Crosby to be visibly nervous and continuously observing Ford F-350.

- Agents also seized from 631 Saint Anns Avenue, Crosby's residence, several bottles containing suspected cutting agents.  While at 631 Saint Anns Avenue, agents located the Acura TLX – noted as Target Vehicle 2 and transported that vehicle to DEA pending a search and seizure warrant.

- On June 20, 2019, agents conducted a canine scan of exterior of both vehicles.  The dog handler advised agents that the canine, which is trained for the detection of controlled substances, gave a positive alert for the presence of a narcotic odor on both vehicles.

- Based on the affiant's extensive experience in investigating drug trafficking crimes, the affiant explained that it is a common technique for drug traffickers to utilize vehicles during their illegal activity.  Based upon the information provided by CS-1 and SOI, coupled with the seized drugs, and positive canine alerts, the affiant believed that Crosby utilized the vehicles to transport and possibly store narcotics in.

*See* Ex. 12 at 17-20.

Under the totality of the circumstances, the affidavit supplied ample factual material from which Judge Copperthite could conclude that there was a fair probability that evidence of drug trafficking and possession of firearms by a felon was likely to be found inside the vehicle.  *See Bynum*, 293 F.3d at 197; *Montieth*, 662 F.3d at 664.  The initial observations of Crosby were made just two days prior and the evidence recovered during the search of his stash location clearly supported the belief that evidence of drug trafficking and firearms would be located in the vehicle.  Therefore, there was certainly a substantial basis for Judge Copperthite to determine that the warrant should be issued.

### B.  A *Franks* Hearing Is Not Warranted

Crosby requests a *Franks* hearing because he argues that the affidavit allegedly contained false information concerning how investigators obtained a search warrant on Crosby's Acura. *Franks*, 438 U.S. at 155; ECF 514.  Generally, a challenging defendant is not entitled to an evidentiary hearing on the sufficiency of a warrant. The only exception to that rule is if the defense makes the substantial showing required by *Franks*. For a defendant to be entitled to a *Franks* hearing, he must make a "dual showing . . . which incorporates both a subjective and an objective threshold component." *United States v. Colkley,* 899 F.2d 297, 300 (4th Cir. 1990).

First, the defendant must show that the affiant to a search warrant made a false representation in, or omission from, the warrant affidavit, "knowingly and intentionally, or with reckless disregard for the truth."  *Franks*, 438 U.S. at 155-56; *Colkley*, 899 F.2d at 300.  The defendant's preliminary showing must be sufficient for the district judge to infer that the false statement or omission was designed to mislead or was made in reckless disregard of whether it would mislead, the issuing judge.  *Colkley*, 899 F.2d at 300–01.

Second, the defendant has the burden to show that the false statement or omission was "essential to the probable cause determination: 'if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.'"  *Id.* at 300 (quoting *Franks*, 434 U.S. at 171–72).  A defendant carries a heavy burden in showing the necessity of a *Franks* hearing.  *See United States v. Jeffus*, 22 F.3d 554, 558 (4th Cir. 1994).  The "showing 'must be more than conclusory' and must be accompanied by a detailed offer of proof."  *Colkley*, 899 F.2d at 300 (quoting *Franks*, 438 U.S. at 171).  Allegations of such misconduct must be supported through affidavits and sworn witness statements, or an explanation of why they cannot be

provided.  *Franks*, 438 U.S. at 171.

When a *Franks* claim is based merely on omission, the defense has a higher burden to show its entitlement to a *Franks* hearing.  Although the omission of information may entitle a defendant to a *Franks* hearing if the omission demonstrates an intent to mislead the issuing magistrate or reckless disregard for the truth, *Colkley*, 899 F.2d at 301–02, the Fourth Circuit has also held that defendants seeking a *Franks* hearing on the basis of mere omission have an especially high burden.  Thus, with respect to the first *Franks* prong, the Fourth Circuit has required defendants "to allege more than 'intentional' omission in the weak sense."  *Id.*  Rather, the Court has recognized that the failure of the affiant to list every conceivable conclusion does not taint the warrant's validity.  *Id.* at 301 (quoting *United States v. Burnes*, 816 F.2d 1354, 1358 (9th Cir. 1987)).  Instead, the defendant must make some affirmative showing that the omission was the result of a <u>deliberate falsehood</u> or of reckless disregard for the truth.  *Colkley*, 899 F.2d at 301.

In this case, Crosby has not made such a showing to warrant a hearing. The DEA report describing law enforcement's seizure of the Acura states that "TFO James Bradley discovered a white Acura, bearing Maryland registration T910985, as witnessed by SA Bone.  TFO Bradley then transported the vehicle form [sic] 631 Saint Anns Avenue to the Baltimore District Office Parking garage for safekeeping, pending a search warrant."   ECF 514 at 2.  The vehicle was transported to the DEA after the search on June 19, 2019.  On June 21, 2019, Judge Copperthite authorized the search and seizure for the vehicle(s).[34]  The affidavit stated that agents "conducted a canine scan of exterior of the Target Vehicles.  The dog handles advised agents that the canine, which is trained for the detection of controlled substances, gave a positive alert for the presence of

---

[34] The search warrant for the Acura and Ford F-350 is attached as Exhibit 12.

a narcotic odor on both Target Vehicles." *See* Ex. 12 at 20.  The discrepancy between the affidavit

and the DEA report does not automatically rise to a reckless disregard of the truth or a deliberate

falsehood, it can barely be called an omission.  There is certainly no intention to mislead.   In fact,

the affidavit paints the entire picture of all the investigative techniques used by the investigators,

which include the canine scan.   Furthermore, the defendant argues that because the warrant did

not lead to the discovery of controlled substances, the claims of having a drug dog at any point are

false.  However, a day had passed between when the drug dog was utilized and when the search

was executed, and the defendant may have very well moved items in the car between then.

Moreover, even if the Court were to consider this an omission, the omitted fact is immaterial to

the probable cause determination, as investigators had accrued several other pieces of information

on Crosby's involvement as the supplier for the Montford DTO, not to mention the seizure of a

large quantity of drugs from the stash house where Crosby was observed prior to his arrest on June

19, 2019.

Accordingly, Crosby's motion for an evidentiary hearing should be denied.  He has not

made the "substantial preliminary showing" with respect to either prong – deliberately false

omission or materiality – as required to warrant a *Franks* hearing. For the same reasons, his Motion

to Suppress the Vehicle Search (ECF 513) should also be denied.

### C.  The Officers Relied on the Warrants in Good Faith

Even if the court has doubts about the quantum of probable cause supporting any of the

warrants discussed above, the motions to suppress should be denied because, in each case, the

executing officers relied in good faith on a facially valid warrant.  *Leon*, 486 U.S. 897.  There is

no suggestion that the issuing judges were anything but neutral and detached, *see Lo-Ji Sales, Inc.

v. New York*, 442 U.S. 319, 326–27 (1979), or that they were misled by information in the affidavit

that the affiants knew was false or would have known was false except for their reckless disregard

of the truth, *see Franks v. Delaware*, 438 U.S. 154 (1978).   Moreover, the affidavits contained

"sufficient indicia of probable cause so as not to render reliance on [them] entirely unreasonable."

*Bynum*, 293 F.3d at 197–99; *United States v. Clutchette*, 24 F.3d 577, 582 (4th Cir. 1994).  Indeed,

the Fourth Circuit has applied the *Leon* good faith exception to the exclusionary rule in

circumstances where the statement of probable cause was far more bare bones than the ones at

issue here.  *See, e.g.*, *United States v. Williams*, 548 F.3d 311 (4th Cir. 2008) (bare assertion that

the targeted dwelling was known to be the defendant's, without explaining how); *United States v.

Harris*, 215 Fed. Appx. 262, 272 (4th Cir. 2007) (unpub.) (no indication that the defendant lived

in the targeted premises, let alone grounds for believing so).

## VI.    Defendant Daniel Blue (ECF 473) Motion to Suppress Surveillance Evidence Obtained With an Electronic Tracking Device Should be Denied.

Blue has moved to suppress evidence seized pursuant to a GPS tracking device placed on

his 2006 Toyota Camry and 2018 Lexus. ECF 473.  Blue does not make any specific argument as

to the deficiency in the application for the court order authorizing the tracking warrant. His motion

repeats the same legal arguments as his other motions, stating that the agent's reliance on the

warrant was unreasonable.  *Id.*  This motion should be denied.

In evaluating whether a search warrant is supported by probable cause, a reviewing court

should assess whether the issuing magistrate had a "substantial basis" to conclude that probable

cause existed.  *See United States v. Abramski*, 706 F.3d 307, 313-14 (4th Cir. 2013).  An issuing

magistrate's determination to issue a search warrant is a "practical, common-sense decision

whether, given all the circumstances set forth in the affidavit before him . . . there is a fair

probability that contraband or evidence of a crime will be found in a particular place."  *United*

*States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213 (1983)).  Because this is a determination rooted in "common sense," a reviewing court should give "great deference" to an issuing magistrates decision to issue a warrant based on the facts before him.  *Montieth*, 662 F.3d at 664.  That review is, again, limited to an inquiry as to whether a "substantial basis" existed for the issuance of the warrant.  *Id.*

The warrants at issue in this case are two GPS tracking warrants issued for a motor vehicle used by Blue, a 2006 Toyota Camry bearing Maryland registration 50133CG, and a 2018 Lexus SUV bearing Maryland registration 7DJ3395.  There were two such warrants: an initial tracking authorization and a continuation authorization for each.[35]  A review of each of the warrants demonstrates that the supporting affidavits did provide probable cause for the issuance of the orders.

The first tracking warrant for the Camry and Lexus were supported by an affidavit dated October 12, 2018 (Ex. 13).  As an initial matter, the affidavit established probable cause to believe that Daniel Blue (the user of the two vehicles at issue in the warrant) was engaged in drug-trafficking activity.  *See* Ex. 13 at ¶¶ 8-30.  The affidavit summarized a number of calls and communications, intercepted over the wiretap, in which Blue made drug deals and discussed his drug-trafficking activities, and used his Camry in furtherance of drug trafficking.  *Id.* at ¶¶ 11-20.  With respect to the Camry, the warrant described Blue operating the Camry after engaging in drug conversations with co-conspirator Charlton Morris on September 21, 2018.  *Id.* at ¶¶ 11-20.  For example, after several communications with Morris, Blue met with Morris on two occasions on

---

[35] The Toyota Camry and Lexus SUV were initially authorized on October 12, 2018 and the search and seizure warrant is attached as Exhibit 13.  The Toyota Camry was continued on November 30, 2018 and again on December 26, 2018, and both search and seizure warrants are attached as Exhibits 14 and 15, respectively.

this date, once at 2:00 p.m., 2:10 p.m., and then again around 3:40 p.m.

During each of these meetings, Blue and Morris discussed meeting and Morris indicated that he was in the Montford and Monument area, "I'm right here at, uh, on Montford at the little (inaudible) barbershop.  I'm by time out though."  *Id.* ¶ 14.  At approximately 2:01 p.m., agents saw Blue and Morris meet on the northwest corner of Monument Street and North Montford Street. After a brief meeting, Blue then entered the Camry and left the area.  *Id.* ¶ 15.

Shortly thereafter, Morris reached out to Blue again.  During that call Morris said, "I'm at the trap yo?"  Blue replied, "Yeah I ain't understand.  What you want me…  Come right down Montford and Monument real fast cause I ain't understand.  I'm ready to drive right there."  Morris acknowledged before the call ended.  At approximately 2:10 p.m., agents observed the Camry approach the intersection of Monument Street and North Montford Avenue and Morris approached, and after talking to blue through the passenger window, Blue again left the area.  *Id.* ¶ 16.  At approximately 3:40 p.m., Blue called Morris, and told him "Yo, we out front." *Id.* ¶ 18. Morris then exited his mother's residence and entered Blue's Camry, then exited a few minutes later.  *Id.*  Based on this series of communications, investigators believed that Blue met Morris in person to either discuss the new supply of drugs or discuss in person when the new supply would be available.  *Id.*

Blue also used his Lexus in furtherance of drug trafficking.  The affidavit summarized a number of calls and communications, intercepted over the wiretap, in which Blue made drug deals and discussed his drug-trafficking activities, and used his Lexus in furtherance of drug trafficking. *Id.* at ¶¶ 21-30.  For example, on October 2, 2018, after a phone conversation between Blue and Davis, investigators observed the two meet at the intersection of E. Monument Street and N. Collington Avenue.  *Id.* at ¶ 22.   After the meeting, Blue left in his Lexus. *Id.*

On that same day, October 2, 2018, Blue met with Crosby, another co-conspirator. During that call Crosby stated, "Yeah, bring me one of em up here and let me check it out." After making arrangements to meet later the call ended. *Id.* at ¶ 23. This call occurred about 20 minutes after meeting with Davis, and investigators believe Blue was still driving his Lexus and planned to transport drugs to Crosby. *Id.* at ¶ 24. The affidavit provided additional examples of Blue meeting with other conspirators, such as Morris and M. Williams, using his Lexus. *Id.* at ¶¶ 25-30.

Overall, the affidavit established the existence of the drug-trafficking activity in question, such as the observations of Blue meeting with co-conspirators during the course of the investigation. Both cars were certainly being used as part of the drug conspiracy. The affidavit set forth why the GPS tracking data for a drug conspiracy car might be relevant: because it is common practice for individuals involved in drug trafficking to utilize multiple vehicles in furtherance of their criminal endeavors. *Id.* at ¶ 31.

In short, the initial warrant application established the existence of the crime (the drug conspiracy), the relationship between the subject vehicle (the Toyota Camry and Lexus) and the activity, and the evidentiary information that was expected to be acquired by the tracking. This was far more sufficient than necessary to justify the issuance of the tracking warrant.

Agents sought permission to continue GPS tracking on Blue's Toyota Camry on November 30, 2018, (affidavit attached as Ex. 14) and again on December 26, 2018 (affidavit attached as Ex. 15), both were authorized by U.S. Magistrate Judge Copperthite. The supporting affidavits restated much of the evidence that had been stated previously, including the history of the wiretap authorizations related to Blue as well as the initial authorization for the GPS tracker authorized by U.S. Magistrate Stephanie Gallagher. Additionally, the affidavit set forth more wiretap calls that had been intercepted between the time of the initial tracking authorization and this continued

authorization: on November 2, 2018 a text message between a middle-man for Blue, and Blue was intercepted discussing a meeting to collect drug proceeds. Ex. 12, *Id.* at ¶¶ 3-9. The affidavit provided additional examples of Blue meeting with other conspirators, such as Davis and Solomon, using his Camry. *Id.* at ¶¶ 10-22. For many of the same reasons as the initial interception, along with the additional wiretap communications and observations, the continuation affidavit again established the existence of the ongoing narcotics conspiracy, as well as the fact that evidence of that criminal activity would be acquired by tracking Blue's vehicle. *Id.* ¶ 23.

Much like the November authorization to continue GPS tracking on Blue's Toyota Camry, the affidavit confirmed that Blue continued to utilize the Toyota Camry in furtherance of his drug trafficking endeavors. *See* Ex. 14 at ¶¶ 3-16. For example, on December 14, 2018, based on intercepted calls between Windeer Washington and Blue, Washington asked the price for "63 benz." *Id.* ¶ 3-4. Blue and Washington did not discuss a meeting location, but based on Blue's follow-up calls investigators believe Blue delivered two and a quarter ounces of cocaine to Washington and he later sent a text message to Washington to check on the quality of the cocaine, "How was everything." *Id.* ¶ 7. Washington responded, "Everything great bro bro. I was just texting you back. Everything good bro bro." *Id.* ¶ 8-9. Based on these communications, investigators believed Blue was providing Washington with cocaine. On December 19, 2018, based on additional intercepted calls between Washington and Blue, investigators monitored the GPS location data on the Camry and observed the vehicle leave Blue's house and travel to Washington's house. *Id.* ¶ 11-16. Ultimately, investigators believe Blue delivered two and a quarter ounces of cocaine to Washington. *Id.*

Overall, the tracking devices were essential in furtherance of the investigation into this drug conspiracy and each warrant was properly issued. Blue's argument that the affidavit was "so

lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" is completely without merit.  As such, Blue's motion to suppress evidence obtained from these tracking devices should be denied.

Even assuming that the tracking warrants did not satisfy the probable cause standard (and they did), the Court should still deny the motion to suppress because any law enforcement reliance on the warrants was completely reasonable and in good faith.  *See United States v. Leon*, 468 U.S. 897 (1984).  The tracking warrants were facially valid.  Also, as discussed in the preceding paragraphs, the warrant affidavits provided a substantial, reasonable basis to believe that the crime was occurring and the tracking information on the Toyota Camry and Lexus would be of evidentiary value.  Any law enforcement officer would have been completely reasonable in relying on such warrants.  Therefore, under the good faith exception stated in *Leon*, the evidence is still admissible.

## VII.    Defendant Daniel Blue (ECF 475) Motion to Suppress Use of Advanced Technology to Identify Cellular Telephones is Moot.

Blue makes a separate motion to suppress the use of advanced technology to identify alternate cellphones that Blue possessed. ECF 475. Specifically, around October 19, 2018, investigators applied for an order allowing law enforcement to use advanced technology to identify other potential cellphones Blue utilized. *Id.*  Blue again does not make any specific argument as to what is deficient in the application for this order.  He alleges that the probable cause for this order was based on wiretap evidence over Target Telephone 9, the line investigators intercepted associated with Blue. ECF 475 at FN2.  Nevertheless, the search warrant was never executed.  Ex. 16.  As such, the government does not intend to introduce any evidence obtained from the October 19, 2018 search warrant.  Accordingly, this motion is moot.

94

**VIII.    Defendant Daniel Blue (ECF 477) Perez Scruggs' (ECF 499) Motion for notice Pursuant to Fed. R. Evid. 404(b) and 609 Should be Denied**

Two of the defendants (Blue and Scruggs) seek the pretrial disclosure of prior bad acts evidence that might be presented pursuant to Fed. R. Evid. 404(b), and prior impeachment convictions that the government might use pursuant to Fed. R. Evid. 609.  *See* Motions for Disclosure/Notice of 404(b) and 609 Evidence (ECF 477 and 499).  The Court should deny the motions as premature or hold them in abeyance pending the trial.  There are several reasons for that action.

First, the 404(b) motion is unnecessary given the nature of the charge.  The defendants are charged in a substantial, wide-ranging narcotics conspiracy.  Any "bad acts" during the charged timeframe would likely be considered overt acts of that conspiracy, and the government does not anticipate seeking the introduction of any act committed by any defendant except acts that are *intrinsic* to the charged conspiracy.  The government has reviewed the criminal histories of the charged defendants and may seek the introduction of prior convictions against any defendants as 404(b) evidence (the government may, of course, use prior convictions as impeachment evidence if any defendant elects to testify).  The government will submit appropriate motions for the admission of any prior convictions closer to trial.

The government notes, however, that the Fourth Circuit has held that "the mere fact that evidence involved activities occurring before the charged time frame of the conspiracy does not automatically transform that evidence into 'other crimes' evidence."  *United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994).  Indeed, "evidence of uncharged conduct is not considered 'other crimes' evidence if it arose out of the same … series of transactions as the charged offense … or if it is necessary to complete the story of the crime (on) trial."  *Id.* (internal citations omitted).

Accordingly, the government reserves the right to present evidence of conduct by Blue and the Montford and OTM DTOs and its co-conspirators in the charged narcotics conspiracy that predates the dates set forth in indictment, to the extent that conduct arose out of the same series of transactions charged in the indictment.  Should the government reconsider this position, it will advise the Court and the parties.

With respect to the motion for disclosure of Rule 609 impeachment convictions, the government suggests that the Court hold such a motion in abeyance until the defendants are advised of their right to testify, or not to testify, during the trial.  There is no need for an additional, pretrial disclosure of such information at this time.

**IX.   Motion to Adopt Motions of Other Defendants by Defendants Tony Solomon (ECF 511), Darryl Adams (ECF 481), Brian Blackston (ECF 503), Daniel Blue (ECF 476), Cheyenne Ellison (ECF 483), Charlton Morris (ECF 490), Wardell Roundheart (ECF 493), Perez Scruggs (ECF 495), Ricardo Simon (ECF 518), Malik Williams (ECF 501).**

Several defendants have filed motions to adopt relevant motions filed by their co-defendants.  Although the government does not object to the adoption of motions of general applicability, it is the government's position that the defendants should be required to particularize their basis for adopting co-defendants' motions to the extent they are relying on different facts or legal authorities.  Otherwise, the government is left in the impossible position of having to guess about the issues to which it should respond and what evidence will need to be presented at the motions hearing.  *See United States v. Hickok*, 481 F.2d 377, 378–79 (9th Cir. 1973) (a motion to suppress evidence must set forth allegations of relevant factual issues "with definiteness, clarity, and specificity"); *United States v. Randle*, 966, F.2d 1209, 1212 (7th Cir. 1992) ("A defendant who seeks to suppress evidence bears the burden of making *a* prima facie showing of illegality.  Reliance on vague, conclusory allegations is insufficient."); *cf. United States v.*

*Peterson*, 524 F.2d 167, 178 (4th Cir. 1975) (defendants who failed to present specific grounds for suppressing evidence at motions hearing could not raise claims for the first time during trial).

**X.    Motion for Leave to File Additional Motions or to Supplement Motions by Tony Solomon (ECF 512), Darryl Adams (ECF 482), Daniel Blue (ECF 484), and Ricardo Simon (ECF 519).**

The government takes no position as to the motions by Solomon, Adams, Blue, and Simon for leave to file additional motions after the deadline imposed by the Court in this case.  However, to the extent the defendants are allowed to file additional motions, the government respectfully requests at least two weeks to respond.

<u>**CONCLUSION**</u>

For all of the foregoing reasons, the Government respectfully requests that the Court deny the Defendants' motions in their entirety.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:   *LaRai Everett*
                                             
LaRai Everett
James T. Wallner
Assistant United States Attorneys
36 S. Charles Street, Fourth Floor
Baltimore, MD 21201
(410) 209-4800 (phone)
(410) 962-3091 (fax)